**BAGKO DEVELOPMENT COMPANY, Robert E. Longwith, and Cathy Longwith, Appellants (Plaintiffs Below),**

v.

**Charles T. DAMITZ and Nila J. Damitz, Appellees (Defendants Below),**

v.

**JIM BAGLEY CONSTRUCTION COMPANY, INC., James B. Bagley, Jr., and James B. Bagley, III, Appellants (Third Party Defendants Below).**

No. 34A04–9309–CV–338.

Court of Appeals of Indiana, Fourth District.

Aug. 23, 1994.

Richard L. Russell, Russell, McIntyre, Jessup & Hilligoss, Kokomo, for appellants.

J. Conrad Maugans, Mark A. Scott, Bayliff, Harrigan Cord & Maugans, Kokomo, for appellees.

RATLIFF, Senior Judge.

## STATEMENT OF THE CASE

Nila and Charles Damitz bought two adjoining lots; on one, they built a $400,000 home and on the other a Little League baseball practice facility. The developer-builder and neighbors brought an action against the Damitzes, seeking to enjoin their use of the

1. The Damitzes have three boys, who were about ages ten, seven and five at the time, and Mr.

practice field. The trial court entered judgment in favor of the Damitzes. We affirm.

## ISSUES

I. Was the practice field a violation of the restrictive covenant contained in the deed?

II. Was the field a violation of the zoning ordinance of Howard County?

III. Did the lights on the infield and the use of the practice field constitute a nuisance?

## FACTS

James Bagley Construction Company, Inc. (Bagley Construction) is a residential developer and builder in Howard County, Indiana. James Bagley, Jr. is sole owner and president; his son James Bagley, III, is vice president. Bagley Construction is the sole owner of BAGKO, which purchased the Willowridge subdivision property. In April of 1990, BAGKO's proposal for the subdivision was approved, and restrictive covenants were recorded. The covenants include this provision: "The lots and land ... shall not, nor shall any part thereof be used or permitted to be used for any purpose other than for residential purposes."

In late 1989, Charles and Nila Damitz contacted Bagley Construction to inquire about the Willowridge subdivision. The Damitzes wanted to purchase two lots, to build on one and to install a Little League baseball infield and batting cage on the second.[1] Originally, Bagley did not want to sell a lot on which the construction company would be unable to build a home; however, when Bagley learned that the home the Damitzes planned to build on the one lot was in the $400,000 price range, Bagley agreed to sell them the adjoining lot.

The Damitzes placed a deposit for the two lots with Bagley Construction in January 1990. Mr. Damitz provided Bagley Construction with a seven page itemization of specific features he desired, including a

Damitz was an active Little League coach.

"shed" on the "extra lot" and "[e]lectrical outlets on side of shed for baseball machine and night lights." A contract for sale of the lots and construction of the home was executed June 11, 1990.[2] The building permit application submitted by Bagley Construction for the lots showed a site plan with the house on one lot and an electrical line from the house to an outbuilding with a light and an exterior electrical outlet on the other lot. Construction began in October; at completion and final closing on July 19, 1991, the cost totalled $426,956. The Damitzes were the first purchasers and builders in Willowridge.

From March or April of 1991 until late September of 1991, the Little League practice facility evolved. There is a complete infield,[3] with bases at a distance of sixty feet, and a backstop. The sodded areas are serviced by an underground sprinkler system. A batting cage with a pitching machine is partially submerged in an eight foot deep trench, stretching 120 feet in length, behind a terraced wall at the back of the lot. Substantial landscaping was undertaken, as the Damitzes were "willing to spend . . . to make it look nice." R. at 789. The trial court found the Damitzes' investment in the practice facility to exceed $45,000.

Mr. Damitz coaches two Little League teams. Each team generally practices on the Damitz field two to three times a week. Both teams practice on the same day, with the first session lasting from 4:00 until 6:00 and the second from 6:00 until 7:30. The Little League season is "very short," starting in April and ending in mid-June. R. at 774.[4] When using the infield, the team "kids do not hit baseballs. [This] is strictly for a coach to hit infield balls to kids to teach them the concept of an infield." R. at 211. No witness—not either of the Bagleys or either of the plaintiff neighbors—had ever seen teams playing a "full-blown game" on the field or a ball hit off the lot.

Neighborhood children also use the field to play soccer, football and baseball with a wiffle ball.

Robert and Cathy Longwith, the neighbors who joined the developer in this action against the Damitzes, built their subdivision home east of the Damitz house. One lot and a street stand between the back of their home and the practice lot. Longwiths were aware of the subdivision restrictive covenants when they signed their sales and construction contract on March 7, 1991. Construction on their home began April 5, 1991 and was completed by final closing on October 10, 1991. The Longwith house faces away from the practice lot, but their bedroom is in the back of their home. When the practice field lights are turned on, light shines into their bedroom through an octagonal window such that they "almost do not need to turn on inside lights." R. at 471. However, a blind can block out the light.

A friend of Mr. Damitz, who subsequently bought a lot and built in the subdivision, gave the Damitzes two light poles for the field. Upon each of these poles Damitz installed two 400 watt bulbs. One pair of lights is directed east onto the infield; the other, west onto the batting cage. During the eighteen months following their installation, the field lights were on only six or seven times. Two of these times the lights were turned on solely for the purpose of aiming them toward the infield and batting cage.[5] On a third occasion, the lights were on until 11:30 P.M. for an adult birthday party at which guests engaged in a baseball game with a wiffle ball. On none of these occasions did the Longwiths complain about the light.

Howard County's zoning ordinance provides that the permitted uses of property

---

2. The contract reserved to Bagley Construction a right of first refusal to purchase the second lot for $20,000 (the Damitzes' purchase price) should the Damitzes decide to sell that lot.

3. The infield was excavated to a depth of one foot and then filled with six inches of ag-lime beneath six inches of brick dust.

4. The court found Mr. Damitz had also conducted practice sessions in the fall (August, September and October of 1991) when the field was first completed. However, no such autumn practices were found to have been held in 1992.

5. Mr. Damitz called Mr. Longwith before the first light adjustment session and invited him to let Mr. Damitz know if the lights bothered him.

zoned R1–Residential include "single family dwelling."

On August 4, 1992, BAGKO Development Company and the Longwiths sued to enjoin both the maintenance and the use of the baseball facility. A bench trial was held on February 3 and February 4, 1993. As the Damitzes had requested special findings, the trial court entered findings of fact and conclusions of law with its order of May 4, 1993 denying injunctive relief. The trial court concluded 1) the development and use of the baseball field and the lights by the Damitzes "is not a violation of the covenants contained in their deed;" 2) such development and use "is not a violation of the zoning ordinance;" and 3) "the use of the baseball field and the lights is not a nuisance." R. at 473.

## DISCUSSION AND DECISION

■ BAGKO and the Longwiths sought a permanent injunction. The denial of an injunction lies within the trial court's sound discretion, and the decision will not be overturned unless arbitrary or an abuse of discretion. *Cooper v. Calandro* (1991), Ind.App., 581 N.E.2d 443. As an equitable remedy, an injunction should be granted only with caution. *Id.*

■ When a party has requested specific findings of fact and conclusions of law under Ind.Trial Rule 52(A), the reviewing court reviews the judgment by first determining whether the evidence supports the trial court's findings and then determining whether the findings support the judgment. *Vanderburgh County Board of Comm'rs v. Rittenhouse* (1991), Ind.App., 575 N.E.2d 663, 665. The judgment will be reversed only when clearly erroneous, i.e., when judgment is unsupported by the findings of fact and conclusions of law entered on the findings. *DeHaan v. DeHaan* (1991), Ind. App., 572 N.E.2d 1315, 1320. Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inference from the evidence to support them. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the

evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility. *Id.*

## I. RESTRICTIVE COVENANT

■ BAGKO [6] claims the trial court erred in concluding as a matter of law that the Damitzes' development and use of a Little League practice facility on their property did not violate the restrictive covenant limiting the property to use for residential purposes. BAGKO recognizes the general rule of strict construction with respect to restrictive covenants on the use of land, but suggests that contemporary suburban demographics require the law to offer more protection for the investments of homeowners.

A restrictive covenant "describes a contract between a grantor and grantee which restricts the grantee's use of land." *Hrisomalos v. Smith* (1992), Ind.App., 600 N.E.2d 1363, 1366. "Restrictions upon the use of land ... are looked upon with disfavor by the courts, and, where they are attempted, they must clearly appear, or they will not be enforced." *American Cannel Coal Co. v. Indiana Cotton Mills* (1922), 78 Ind.App. 115, 134 N.E. 891, 892. Although the law does not favor restrictive covenants, courts enforce them in equity when "the restrictions are unambiguous and do not violate public policy." *Hrisomalos, supra* at 1366.

The restriction by covenant of the property purchased by the Damitzes is to use "for residential purposes." The term "residential purposes" was not defined in the recorded covenants. "Residential use is distinguishable from commercial or business use." *Adult Group Properties, Ltd. v. Imler* (1987), Ind.App., 505 N.E.2d 459, 469 (dissenting opinion). Similarly, other authorities have declared "residential purposes" in a restrictive covenant to "merely limit the use of the property to living purposes as distinguished from business or commercial purposes." *Voedisch v. Town of Wolfeboro* (1992), 136 N.H. 91, 612 A.2d 902, 905 (owners' use of

---

6. Hereinafter, "BAGKO" refers to assertions presented on behalf of BAGKO Development Company and James and Cathy Longwith.

lakefront lot to construct dock used by their boat to travel to and from their island home not inconsistent with restrictive covenant limiting the use of the lot to "residential purposes only"); 20 Am.Jur.2d, Covenants § 196, p. 765.[7]

There is no evidence in the record that the Damitzes' field had been used for any business or commercial purpose. The trial court found that no Willowridge covenant restricted or excluded the construction or use of recreational facilities. R. at 472. The court further found that in the Kokomo community, "'residential use' includes the construction and use of tennis courts, basketball courts, and swimming pools." *Id.* BAGKO does not challenge these findings, and they are supported by the testimony of various witnesses. The trial court's conclusion that the Damitzes' development and use of their Little League practice facility does not violate the restrictive covenant is not clearly erroneous.

## II. ZONING ORDINANCE

■ BAGKO claims the trial court erred in concluding as a matter of law that the Damitzes' development and use of a Little League practice facility on their property did not violate the Howard County zoning ordinance. BAGKO refers us to the factual findings which cite two permitted uses of property zoned R1–Residential: "1. Single family dwelling. 2. Public park, playground, recreation area." R. at 472. Without authority, BAGKO appears to argue that since the second lot is neither a single family dwelling nor a public park, playground or recreation area (because the Damitzes have limited its use), there is a zoning violation. According to BAGKO's reasoning, a Howard County homeowner who bought adjoining R1–Residential lots and built on one but conducted any private recreational activity on the second, without having constructed a single family dwelling on that lot, would be subject to citation for violation. Similarly, a family who purchased a single R1–Residential lot and who used the lot to picnic and play volleyball until such time as they could afford to build on the lot would risk citation.

As the Damitzes note, "zoning laws which limit the use of real property are strictly construed because they are in derogation of the common law. Therefore, such ordinances are construed to favor the free use of land and restrictions are not extended by implication." *Ayers v. Porter County Plan Comm'n* (1989), Ind.App., 544 N.E.2d 213, 219. The trial court found a building permit may be "obtained to build a house on two lots whether the house is built on one of the two lots or on the dividing line as long as there is no easement along the dividing lot line," and "[t]here are no easements between" the two Damitz lots. R. at 469. This suggests that the building application is considered for compliance one parcel consisting of two lots.

The Damitzes further argue that their baseball practice facility is an accessory recreational use of their property, citing *Boone County Area Plan Comm'n v. Kennedy* (1990), Ind.App., 560 N.E.2d 692. The proposed development of a fifteen acre private skeet range within a forty acre parcel on which the owner maintained a four bedroom "country home" was held to be "an accessory use of the subject real estate." *Id.* at 696. For the definition of accessory use, the *Kennedy* court looked to *Metro. Development Comm'n v. Villages, Inc.* (1984), Ind.App., 464 N.E.2d 367. "An accessory use must be subordinate in area, extent, and purpose to the primary use of the lot." *Id.* at 369. In

---

7. Another jurisdiction focused on the word "purpose" in deciding that building a tennis court on an adjoining lot for the recreation of one's family and friends did not violate a restrictive covenant limiting lots to use "for single family residential purposes only" because the "key word is 'purpose,'" and the recreational development on the double lot "as a whole" was consonant with that purpose. *Elder v. Watts* (1984), 252 Ga. 212, 312 S.E.2d 331. Another court found the "term 'residential purposes' requires the use of property for *living* purposes as opposed to business or commercial purposes." *Winn v. Ridgewood Development Co.* (1985), Tex.App., 691 S.W.2d 832, 835. A two-story redwood treehouse professionally constructed on the homeowner's adjoining lot was held not to violate a restriction to "private residence purposes only" because when "there was no evidence that [the lot] and the treehouse were being used for business or commercial purposes, the only logical conclusion is that it was being used for 'living purposes' and that the character of the treehouse is consistent with a residential use." *Id.*

the present case, the Damitzes purchased a double lot parcel upon which they built a home costing well over $400,000; their expenditure to develop the practice facility was about ten percent of that amount. The Damitzes built their home as a residence ("single family dwelling," in the language of the zoning ordinance), in which they live with their three children on a full time basis.[8] Clearly, the primary Damitz use of the double lot is residential. The use of the practice facility for approximately 8.75 hours a week (three and one-half hours on an average of two and a half times a week) for about ten weeks of the year is subordinate to their primary residential use.

The trial court's conclusion that the Damitzes' use of the baseball facility does not violate the county zoning ordinance is not clearly erroneous.

### III.  NUISANCE

BAGKO contends the trial court erred in concluding as a matter of law that the use of the practice field and the lights was not a nuisance. BAGKO argues the trial court's findings of

1) installation of two light poles, each with two 400 watt bulbs and a total light power rating of 144,000 lumens;

2) use of these lights at several organized baseball practices;

3) location of the Longwith home with respect to the field and lights; and

4) when the field lights are turned on, light shines through the Longwiths' bedroom window

require the conclusion that the lights are "blinding" and "offensive to the senses of the Longwiths" and, thus, constitute a nuisance. Appellant's brief at 18.

■ BAGKO appeals from a negative judgment, having borne the burden of proof at trial. *See Reiss v. Reiss* (1987), Ind., 516 N.E.2d 7. We will not reverse a negative judgment on appeal unless it is contrary to law. *Indiana Farm Bureau Co–Op. v. En-*

*nis* (1991), Ind.App., 574 N.E.2d 322, 323. We will not reweigh the evidence or judge witness credibility; thus, BAGKO has the "burden of proving that the evidence is without conflict and leads unerringly to a conclusion opposite that that reached by the trial court." *Id.*

■ In Indiana, nuisances are defined by statute. Ind.Code 34–1–52–1 provides:

Whatever is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action.

BAGKO refers us to *Cox v. Schlachter* (1970), 147 Ind.App. 530, 262 N.E.2d 550, for the proposition that the essence of a private nuisance is the fact that one party is using his property to the detriment of use and enjoyment of property of another. However, we look to the facts in that case to anchor the proposition's application: Cox operated a mice-raising facility which produced an "objectionable odor, produced by the accumulation of urine, droppings and dead mice, from among the thousands of mice raised" next door to the complaining property owner and "expelled [the odor] into plaintiffs' back yard by powerful [exhaust] fans." *Id.* 262 N.E.2d at 552. Beyond the odor, "the sight of maggots rolling through a fence, the collection of two gallons of blowflies by neighbors and a putrid smell which brings tears to the eyes of nearby residents, drives them from their yards to the protection of their homes and robs them of their sleep" sustained a finding that this mice-raising constituted a nuisance. Not only is the degree of "offensiveness" in *Cox* massively greater than that posed by the practice field, but the offensiveness was constant "through a period of years." *Id.*

BAGKO next cites to *Wendt v. Kerkhof* (1992), Ind.App., 594 N.E.2d 795, for the necessity of balancing the competing interests of landowners and using a common sense approach to decide whether one's use of his property is a nuisance to his neighbors.

---

8. In their reply brief, BAGKO argues that the Damitzes' use of the practice facility for "organized baseball practice for two teams conducted several times per week throughout the baseball season" exceeds the accessory use described in *Boone, supra.* Consistent with the reasoning which follows, we disagree.

In determining what constitutes a nuisance, *Wendt* propounded the relevant inquiry as "whether the thing complained of produces such a condition as in the judgment of reasonable persons is naturally productive of actual physical discomfort to persons of ordinary sensibility, tastes and habits." *Id.* at 797. Again, the claimed nuisance involved an odor—from a hog farm. As in the *Cox* mice-raising operation, odor from a hog farming operation might be assumed to be year-round. However, the trial court found that as "the majority of the time the prevailing wind in Indiana is southwesterly," the complaining neighbor was "downwind" of the hog farm; therefore, injunctive relief was denied. On appeal, we found sufficient evidence to support the trial court's conclusion that no nuisance existed because where "conflicting evidence exists regarding the plaintiffs' claims sounding in nuisance, and on appeal they merely ask us to reweigh the evidence, we must affirm." *Id.* at 798.

In addition to the findings cited by BAGKO about the practice field lights, the trial court made the following findings of fact:

From July 28, 1991, until the trial [18 months], the lights have been on only six or seven times. On two occasions they were on for the purpose of aiming them onto the field and batting cage. Mr. Damitz called Mr. Longwith before turning them on the first time and invited him to let him know if the lights bothered him. Mr. Longwith made no objection to the lights or the baseball diamond at that time. On one occasion the lights were on until 11:30 P.M. for an adult birthday party and the Longwiths made no complaint at that time.

No witnesses described any actual physical discomfort, loss of sleep, or other health related symptoms nor was there any evidence of odors or indecency as a result of the lights or other uses of the Damitz premises.

The trial court's findings do not require the conclusion that the use of the practice field and lights "produce such a condition as in judgment of reasonable persons is naturally productive of actual physical discomfort to persons of ordinary sensibility, tastes and habits." *Wendt, supra* at 797. The trial court's conclusion that the use of the practice field and lights do not constitute a nuisance is not clearly erroneous.

Affirmed.

CHEZEM and RUCKER, JJ. concur.