# CIRCUIT COURT OF ALBEMARLE COUNTY

Kenneth G. Lape et al.

v.

Audrey Lea Haisfield et al.

June 14, 2001

Case No. (Law) CL00-8407

BY JUDGE PAUL M. PEATROSS, JR.

This matter was tried before the Court without a jury on May 24, 2001. Both sides presented evidence, and the Court took a view of the real estate in question at the request of plaintiffs without objection from defendants. The Court took the matter under advisement to receive additional legal authority and argument from counsel within fourteen days of May 24, 2001.

*Factual Findings*

Kenneth R. Lape and Barbara G. Lape, Trustees for the Kenneth R. Lape Living Trust, entered into a contract or "purchase agreement" for the sale of 98.78 acres known as Laurel Ridge in Albemarle County, Virginia, to Audrey Lea Haisfield (or "Laurel LLC") by written contract dated February 14, 2000.

Audrey Lea Haisfield, hereafter referred to as "Purchaser," made a deposit of $50,000.00 to McLean Faulconer, Inc., realtor and identified as escrow agent. A proposed closing date was established in the purchase agreement of June 30, 2000.

The purchase agreement also provided for liquidated damages and stated: "Should purchaser default and/or breach this contract, the seller shall be entitled to retain the earnest money deposited of $50,000.00 as liquidated damages in lieu of all other remedies provided at law or in equity against the purchaser."

A title search by the purchaser revealed a restriction[1] applying to the 98-acre tract which stated: "The grantors covenant for themselves, their successors, and assigns, that for a period of thirty (30) years from the date of this deed, no building shall be built on the current Albemarle County Tax Map Parcel 111-5A [a portion of the 98.81 residue parcel of grantors as depicted on the plat] which may be visible from the main residence [Oakmont] located on the property conveyed by this deed." By letters dated June 29 and June 30, 2000, respectively, Marshall M. Slayton, attorney for purchaser notified seller's attorney, Wendell L. Winn, Jr., of this alleged Title Defect referring in those letters to paragraph 14 of the Real Estate Contract introduced as Plaintiffs' Exhibit 1. (Contract of February 14, 2000.) Paragraph 14 states:

> TITLE: At settlement seller shall convey the Property to the Purchaser by a general warranty deed containing English covenants of title, free of all encumbrances, tenancies, and liens (for taxes and otherwise), but subject to such restrictive covenants and utility easements of record which do not materially and adversely affect the use of the Property for residential purposes or render the title unmarketable.

Purchaser took the position in the letters of June 29 and June 30, 2000 (Plaintiffs' Exhibits 3 and 4) that the "view" restriction from Oakmont as to buildings on the 98-acre parcel, "Laurel Ridge," was a restriction which "materially and adversely affected the use of the Property for residential purposes or rendered the Title unmarketable."

Kenneth Lape, one of the plaintiffs, testified that he originally owned the tract including Oakmont and the 98-acre tract which he retained after the sale of Oakmont in 1994 to Dr. Hamilton Moses, III, and Alexandra Gibson Moses. The deed from the Lapes to the Moses was received into evidence as Defendants' Exhibit 1.

Mr. Lape testified that as one views the Laurel Ridge tract from Oakmont, one looks at a hill covered with hardwood trees which ascends in elevation approximately 150 feet. The Oakmont residence measures 1000 to

---

[1] The Court has excluded reference to a second restrictive covenant attached to Laurel Ridge preventing removal of commercial timber for thirty years on a strip 150 to 350 feet wide and 850 feet in length. This restrictive covenant is not at issue because the purchaser did not inform the seller prior to the closing date of June 30, 2000, that this particular restriction was a "title defect" requiring curing under the purchase agreement.

1200 feet from the property line of Laurel Ridge. Kenneth and Barbara Lape built a residence on the Laurel Ridge property and a distance of 1,742 feet separates the houses if one walks a straight line. Mr. Lape also testified that the property between the two residences consists of dense, mature trees with undergrowth and that one can see 50 yards at most when looking into the woods. He also testified that the elevation at Laurel Ridge is 600 feet and the elevation goes down 150 feet, up a hill, down another hill into a ravine, and then up to Oakmont. The elevation of Oakmont is 580 feet. Mr. Lape also testified that of the 98 acres of land at Laurel Ridge, 92 to 93 acres were forested in mature trees. The view taken by the Court confirms the above facts.

Mr. Lape also testified that the residence at Laurel Ridge could not be seen from Oakmont at any season of the year. He stated that there were many sites for building on the Laurel Ridge land that would not be in the view of Oakmont. The view by the Court also confirms these facts.

The Court also received into evidence Defendants' Exhibit 5, which was a set of proposed plans prepared by SLDC, Limited, for improvements to the residence at Laurel Ridge prepared for Mr. and Mrs. Richard Haisfield. Mr. Andrews of SLDC testified that Mr. and Mrs. Haisfield approved these plans on or about June 7, 2000, and he was asked to get contractors to bid on the improvements. The improvements were additions or modifications to the existing house and the building of a horse barn facility in the back of the Laurel Ridge house. The elevations of all these structures, including a proposed garage with a second floor apartment, were not higher than the existing Lape residence.

Defendant Audrey Haisfield testified that her plans were to occupy the 98-acre Laurel Ridge tract as a primary residence. She stated that she intended to move her 29 to 30 horses to the property after constructing an indoor arena, outdoor arena, round pin, housing units for her employees, barn, pastures, and riding trails on the property as well as a swimming pool and several ponds located throughout the property.

Ms. Haisfield testified that her desire was to move to the property and "get a feel" for the property before she made any final decision as to improvements for her use of the property as a residence and as a horse operation for her horses.

The Court also received evidence that Plaintiffs' Exhibit 1 granted purchaser an option to buy a 258-acre tract ("Option Property") adjacent to the 98-acre tract. Plaintiffs' Exhibit 8 is a proposal prepared upon request from Ms. Haisfield for her consideration to place the equestrian center on the 258-acre Option Property. Ms. Haisfield testified that this was one option she

was considering as an alternative to placing the improvements on the 98-acre tract where she feared they would be visible from Oakmont.

Ms. Haisfield testified that she had a contract to either purchase or have an option to purchase the Gordon tract, which is the triangular tract of property in between Laurel Ridge and the 258-acre Option Property shown on Plaintiffs Exhibit 8 containing pasture and a pond. Her plan was to put the three properties together and to close on all three at the same time. This plan was verified by her attorney, Forbes Reback, at trial.

The Court also received testimony that purchaser made a second offer to sellers in late October or early November of 2000. This offer was for the same amount of money and the same property contained in the original purchase agreement, i.e., the purchase of the 98-acre Laurel Ridge property with the option to purchase the 258-acre Option Property.

In its view, the Court walked to the residence at Oakmont and viewed the Laurel Ridge property. It also visited the Laurel Ridge residence. Both residences are located at the top of hills.

### Questions Presented

I. Whether the "view" easement from Oakmont constitutes a "restrictive covenant" that materially and adversely affects the use of the Laurel Ridge property for residential purposes according to the relevant terms of the purchase agreement found in Section 14?

II. Whether the view easement renders the title unmarketable under the terms of the purchase agreement?

### Legal Arguments and Conclusions

#### I. Whether the Restrictive Covenant Materially and Adversely Affects the Property for Residential Use

The Court holds that the view easement does not constitute a restrictive covenant that materially and adversely affects the use of the Laurel Ridge Property for residential purposes. In reaching this decision, the Court was heavily influenced by the fact that a substantial residence already exists on Laurel Ridge that cannot be seen from Oakmont and thus does not violate the view easement. Clearly, the mere existence of the Lape house is the strongest evidence that the restrictive covenant does not materially affect the use of the property for residential purposes. It is also worth noting that, while Ms. Haisfield had plans to make improvements and additions to the Lape

residence, none of her architectural plans depicted improvements that would be higher than existing structural elevations.

As Plaintiff's counsel points out in his supporting memorandum, the term "for residential purposes" does not include improvements to the property that are commercial or agricultural in nature. See *Jernigan v. Capps*, 187 Va. 73, 80, 45 S.E.2d 886 (1948) (holding that a residential building is one that is used for residential purposes, that is, "one in which people reside or dwell, as distinguished from one which is used for commercial or business purposes"); 20 Am. Jur., *Covenants, Conditions, and Restrictions*, § 186, citing *Timms v. Griffith*, 68 S.W.2d 535 (Tex. Civ. App.) (holding that term "residential purposes" does not include erecting a stable and keeping horses).

The Court was presented with evidence indicating that Ms. Haisfield intended to improve the property at some point in the future by constructing some or all of the following: a barn for her horses, a pasture, riding trails, an indoor and outdoor arena, a round pin, homes for her employees, wine vineyards, and several ponds or lakes. However, whether or not the construction of these improvements would violate the restrictive covenant is irrelevant due to the fact that these intended uses fall outside of the realm of "residential purposes."

Defense counsel in his supporting memorandum asks the Court to interpret the phrase "for residential purposes" objectively, claiming that the Court should not limit its review to only those improvements found in Ms. Haisfield's architectural plans, but should also consider any possible improvements that could be made which would violate the restrictive covenant. For example, Mr. Wright puts forth several cases which define the phrase "for residential purposes" as including such structures as tennis courts, basketball courts, baseball fields, gardens, tree-houses, and swimming pools. See generally *Bagko Devel. Co. v. Damitz*, 640 N.E.2d 67 (Ind. App. 1994) (holding that these structures are within the purpose of a single-family residence). Mr. Wright's argument is that Ms. Haisfield would be prohibited by the view easement from building these improvements in the future and losing the right to make these improvements materially and adversely affects Ms. Haisfield's ability to use and enjoy her property for residential purposes. The Court rejects this argument.

There is no evidence that Ms. Haisfield intended to make these improvements, with the exception of perhaps a swimming pool. More importantly, there is no evidence before the Court that the construction of any of these features would violate the view easement. Even if the Court were to assume that the restrictive covenant would prevent Ms. Haisfield from building one or more of these improvements, the Court is not convinced that

such deprivation would "materially" affect her ability to use the property for residential purposes.

Finally, counsel for Defense argues that Ms. Haisfield specifically intended to build a new road to access the Option Property. Because construction of the road would likely violate the restrictive covenant, Ms. Haisfield would be prevented from constructing the road and thus be materially and adversely affected. In support of his argument, Mr. Wright cites an Arkansas case in which the court allows the construction of a road despite the existence of a restrictive covenant limiting property use to residential purposes only. See *Casebeer v. Beacon Realty, Inc.*, 248 Ark. 22, 449 S.W.2d 701 (1970). However, the restrictive covenant in the case at hand only prevents the erection of *buildings* on the Laurel Ridge property that can be viewed from Oakmont. There is no evidence that the construction of an access road for residential purposes will violate the view easement. See generally *Neekamp v. Huntington Chamber of Commerce*, 99 W. Va. 388, 129 S.E. 314 (1925) (holding that "the word 'building' cannot be held to include every species of erection on land, such as fences, gates, or other like structures," and rejecting the argument that a railroad track constitutes a building); *Hemenway v. Bartevian*, 321 Mass. 226, 72 N.E.2d 536 (1947) (holding that the extension and modification of a concrete entranceway did not constitute a "building" so as to violate a restrictive covenant).

For the above stated reasons, Defendant has failed to prove that the restrictive covenant materially and adversely affects her ability to use the Laurel Ridge property for residential purposes.

## II. *Whether the Restrictive Covenant Renders the Title Unmarketable*

The Court also finds that the restrictive covenant does not render the title unmarketable. The question of marketability of title is a question of law for the Court. *Madbeth, Inc. v. Weade*, 204 Va. 199, 202, 129 S.E.2d 667, 669-70 (1963). In *Madbeth*, the Supreme Court of Virginia defined a marketable title as such:

A marketable title is one which is free from liens and encumbrances; one which discloses no serious defects and is dependent for its validity upon no doubtful questions of law or fact; one which will not expose the purchaser to the hazard of litigation or embarrass him in the peaceable enjoyment of the land; one which a reasonable well-informed and prudent person, acting upon business principles and with full knowledge of the facts and their legal significance,

would be willing to accept, with the assurance that he, in turn, could sell or mortgage the property at its fair value.

*Id.* at 202, 129 S.E.2d at 669-70.

In his supporting memorandum, counsel for Defense focuses on the language "free from liens and encumbrances" and "one which will not embarrass [the Purchaser] in the peaceable enjoyment of the land." *Id.* The essence of Mr. Wright's argument is that the restrictive covenant attached to the Laurel Ridge property is a negative easement, and all negative easements are encumbrances. See generally 77 Am. Jur. 2d., *Vendor and Purchaser*, § 210 (stating that "private covenants or agreements imposing restrictions as to the use to which premises may be put ... render the title unmarketable). Because a marketable title under *Madbeth* is one that is free from all encumbrances, title in the case at hand is unmarketable. *Madbeth*, 204 Va. at 202, 129 S.E.2d at 669-70; see also *McAllister v. Harmon*, 101 Va. 17, 42 S.E. 920, 922-23 (1902) (holding purchaser need only show that encumbrance may negatively impact his ability to develop or enjoy his property to render title unmarketable). The Court rejects this argument.

While Mr. Wright's legal reasoning appears sound at first glance, his argument cannot be applied directly to the case at hand in light of the specific language found in the relevant portion of the purchase agreement. Section 14 of the purchase agreement states:

At settlement Seller shall convey the Property to the Purchaser by general warranty deed containing English covenants of title, free of all encumbrances, tenancies, liens (for taxes or otherwise), *but subject to such restrictive covenants and utility easements of record which do not materially and adversely affect the use of the Property for residential purposes or render the title unmarketable.*

(Emphasis added.) Because the terms of the purchase agreement specifically allow for the presence of some restrictive covenants, Mr. Wright's argument that title must be completely free from all encumbrances fails.

Mr. Wright's second argument supporting the claim that the title is unmarketable is grounded upon testimony by Dr. Moses indicating that he might initiate a legal action in the future to prevent Ms. Haisfield from building an access road to the Option Property. According to Dr. Moses' deposition, he believes that construction of such a road *may* violate one or both restrictive covenants. Defense counsel argues that Dr. Moses' testimony is evidence that Ms. Haisfield may be exposed to the threat of litigation and may be "embarrassed ... in the peaceable enjoyment of the land." *Madbeth*,

204 Va. at 202, 129 S.E.2d at 669-70. Accordingly, under the definition of marketable title as laid out in *Madbeth*, the threat of such litigation renders the title unmarketable. See *id.* 204 Va. 199. The Court does not agree with this argument.

In *Madbeth*, the seller of a two-acre piece of property brought an action for breach of contract against the purchaser when the purchaser refused to close the deal pursuant to the purchase agreement. The purchase agreement provided that the property title was to be "free and clear of all liens and indebtedness of every kind." *Id.* at 200. The defendant-purchaser denied that he was in breach, claiming that certain clouds on the title existed which the seller failed to cure and which rendered the title unmarketable. Specifically, the two-acre parcel of land was part of a larger tract that had been conveyed away in piece-meal fashion by several different conveyances during previous years. The exact boundaries and descriptions of these prior conveyances were vague and indefinite. There was also evidence of the existence of a sewer easement located somewhere on the two-acre property. Because of the high probability of overlapping conveyances, multiple claims to the property, and the existence of an easement whose dimensions and location were unknown, the Supreme Court of Virginia ruled that the title was unmarketable. *Id.* at 203. The Court based its ruling on the "hazard" of litigation that a purchaser would likely face and the "necessity to resort to extrinsic proofs." *Id.* 204 Va. 199.

As stated above, the purchase agreement in the present case, unlike that in *Madbeth*, does not require the property to be completely free of all liens and encumbrances at closing. The Court also finds that the view easement attached to the Laurel Ridge property is clearly distinguishable from the multitude of claims and the ambiguous easement encumbering the two-acre property in *Madbeth*.

The test for determining unmarketable title is an objective one, where title is considered "unmarketable" only where a *reasonable buyer* would refuse to accept the property due to conflicting interests in or litigation over the property. See *Madbeth*, 204 Va. at 202, 129 S.E.2d at 670. *Madbeth* does not require this Court to find the title "unmarketable" simply based on the possibility of future litigation that *may* result from *future* intentions and improvements to the property contemplated by Ms. Haisfield prior to sale. Even if the Court were to look specifically at Ms. Haisfield's plans for Laurel Ridge, there is no evidence to suggest that her contemplated access road will violate the restrictive covenants and lead to a litigious battle with her neighbors at Oakmont.

Applying the test as set forth in *Madbeth*, the Court does not find that the restrictive covenant renders the title in the present case unmarketable. Despite

Ms. Haisfield's planned improvements and Dr. Moses' testimony, there is little evidence that the purchaser of Laurel Ridge would be subject to embarrassing litigation that would prevent him or her from the peaceable enjoyment of the property. In addition, the Court has difficulty accepting Defendant's argument that the title is no longer marketable in light of Ms. Haisfield's renewed offer to purchase Laurel Ridge in November 2000. It is worth noting that this renewed offer, initiated by the Defendant, was for the same amount previously agreed upon by the two parties prior to discovery of the restrictive covenants by Ms. Haisfield.

For the reasons stated above, the Court finds that the restrictive covenant, under the terms of the purchase agreement, does not adversely and materially affect the use of the property for residential purposes or render the title unmarketable. As a result, Defendant's refusal to make payment on June 30, 2000, as required under the purchase agreement, constitutes a breach of contract for which the Plaintiffs are entitled to judgment in the amount of $50,000 liquidated damages.

The Court notes that there was no evidence presented at trial to support a claim for attorney's fees; consequently, none shall be awarded.

## Conclusion

Defendant McLean Faulconer is ordered to pay the sum of $50,000 to Plaintiffs plus any interest earned to be credited to the judgment herein awarded Plaintiffs against Defendants of $50,000 plus interest at the judgment rate from June 30, 2000, plus costs of court.