**TIPPECANOE ASSOCIATES II, LLC, Appellant–Defendant,**

v.

**KIMCO LAFAYETTE 671, INC., Appellee–Plaintiff.**

No. 79A05–0302–CV–85.

Court of Appeals of Indiana.

July 6, 2004.

Charles R. Vaughan, Linda H. Havel, Vaughan and Vaughan, Lafayette, IN, Attorneys for Appellant.

Stephen R. Pennell, Stuart & Branigin, LLP, Lafayette, IN, Attorney for Appellee.

## OPINION

MAY, Judge.

Tippecanoe Associates II, LLC ("Tippecanoe") appeals the trial court's grant of declaratory judgment in favor of Kimco Lafayette 671, Inc. ("Kimco"). Tippecanoe raises two issues, which we reorder and restate as:

1. Whether the trial judge abused his discretion when he refused to recuse himself; and

2. Whether the trial court's declaratory judgment in favor of Kimco was clearly erroneous.[1]

We affirm in part and reverse in part.

---

1. In addition, Tippecanoe asserts in a footnote:

For these same reasons, the trial court abused its discretion in denying interven-

## FACTS AND PROCEDURAL HISTORY

In 1973, SES Development Company ("SES") owned the Sagamore Shopping Center ("shopping center") located at the intersection of the State Road 52 by-pass and State Road 26 in Lafayette, Indiana. On April 27, 1973, Kroger Company ("Kroger") leased one of the stores in the shopping center from SES for a term of twenty years, with an option to extend the lease by four successive terms of five years each.[2] The lease contains the following restrictive covenant:

> Landlord covenants and agrees, from and after the decree hereof and for so long as this lease shall be in effect, not to lease, rent, occupy, or suffer or permit to be occupied, any part of the Shopping Center premises or any other premises owned or controlled directly or indirectly either by Landlord, its successors, heirs or assigns, or Landlord's

tion of [Tippecanoe Associates, LLC ("TA–I")] and [Elmwood Properties, LLC ("Elmwood")]. *See In re Remonstrance Appealing Ordinance Nos. 98–004, et seq., of the Town of Lizton v. Storm,* 737 N.E.2d 767 (Ind.Ct. App.2000); *E.N. Maisel & Assoc. v. Canden Corp.,* 398 N.E.2d 1366, 1368 (Ind.App. 1980) (representation is inadequate if the putative representative has interest divergent from the applicant's interest). The court also ruled [TA–I] and Elmwood were necessary and indispensable parties under Rule 19(A) to [Tippecanoe]'s **compulsory** counterclaim. (If a party meets the requirement under the joinder rule, the Court has no recourse but to grant the motion.) *Ind. Law Encyclopedia,* § 76.[sic]

(Br. of Appellant at 23 n. 3) (emphasis original). This "argument" does not have the "argument heading" required by Ind.App. R. 46(A)(8)(c), the "brief statement of the procedural and substantive facts necessary for consideration" of the issue as required by App. R. 46(A)(8)(b), or the "cogent reasoning" required by App. R. 46(A)(8)(a). Accordingly, this assertion of error is waived. *See, e.g., Srivastava v. Indianapolis Hebrew Congregation, Inc.,* 779 N.E.2d 52, 55 n. 1 (Ind.Ct.App. 2002), *trans. denied* 792 N.E.2d 42 (Ind.2003).

Waiver notwithstanding, no abuse of discretion occurred. To intervene as a matter of right under Ind. Trial Rule 24(A), parties must demonstrate: "(1) that they have an interest in the subject of the action; (2) that the disposition of the action may as a practical matter impede protection of their interest; and (3) that representation of their interest by existing parties is inadequate." *Fuehrer,* 737 N.E.2d at 769. In its brief, Tippecanoe provided only one reason TA–I and Elmwood have an interest in the subject matter of this case—placement of Schnucks grocery store in the old Target location will decrease profits for both of those businesses. As that is the same reason Tippecanoe asserts Kimco must honor the restrictive covenant, TA–I's and Elmwood's interests are adequately represented by Tippecanoe. The trial court did not abuse its discretion when it denied the motion to intervene.

In another footnote, embedded in its allegations the trial court judge was biased, Tippecanoe claims the trial court's denial of its motion for a continuance was an abuse of discretion. As Tippecanoe notes, we review the grant or denial of a motion for a continuance for an abuse of discretion. *See, e.g., Tapia v. State,* 753 N.E.2d 581, 586 (Ind. 2001). Tippecanoe claims a continuance was required because it "had not been given time to review, investigate or prepare a defense to the stack of material discovery turned over by Kimco at 4:30 the night before trial." (Br. of Appellant at 30 n. 4.) However, Tippecanoe has not given us any indication what kind of information those documents contained or why it could not be prepared the next day. Accordingly, Tippecanoe has not demonstrated it was prejudiced by the trial court's refusal to continue the trial, and we cannot find an abuse of discretion. *See Tapia,* 753 N.E.2d at 587 (no abuse of discretion in denial of continuance when appellant failed to explain "what would be gained from further delay").

2. The parties entered a "lease modification agreement" that changed the starting date of the twenty-year term to June 1, 1974, changed the monthly rental rate, and changed the base sales rate after which Kroger would pay a percentage of sales to SES. (Appellant's App. at 21.) However, that modification agreement did not impact the provisions at issue in this appeal.

principal owners, stockholders, directors, or officers, or their assignees (hereinafter called owners) which are within 2 miles of the Shopping Center premises for the purpose of conducting therein or for the use as a food store or a food department or for the storage or sale for off-premises consumption of groceries, meats, produce, dairy products, or bakery products, or any of them; and further, that if Landlord or owners own any land, or hereinafter during the term of this lease Landlord or Owners acquire any land within such distance of the Shopping Center, neither will convey the same without imposing thereon a restriction to secure compliance with the terms of this lease.... This covenant shall run with the land. Landlord acknowledges that in the event of any breach hereof Tenant's remedies at law would be inadequate and therefore, in such event, Tenant shall be entitled to cancel this lease or to relief by injunction, or otherwise, at Tenant's option, and Tenant's remedies shall be cumulative rather than exclusive.

(Appellant's App. at 14.)

The agreement also provided:

Tenant may sublet or assign the demised premises at any time provided the business which such subtenant or assignee proposes to conduct does not conflict with exclusive rights granted by Landlord in leases to other tenants. Tenant [illegible] notify Landlord of its intent to sublet or assign and the nature of the business proposed to be conducted by the subtenant or assignee. If such notice is given and Landlord does not object within [illegible] days, it shall be conclusively presumed that the proposed business does not conflict with any exclusive rights. Landlord shall, at any time Tenant may request, supply to Tenant copies from leases to other tenants of all clauses granting exclusive rights to conduct various businesses in the Shopping Center. In the event of assignment or sublease, Tenant is hereby put on notice that Landlord prefers a qualified supermarket operator.

(*Id.* at 17.)

On March 25, 1983, Kroger assigned its rights to Pay Less Super Markets, Inc., effective April 1, 1983. On June 1, 1984, Pay Less Super Markets sub-leased the space to H.H. Gregg Appliances, Inc., who remains the tenant to this day.

On January 15, 1997, Kimco purchased the shopping center. At that time, 79,020 square feet of the 183,440 square feet in the shopping center were occupied by Target.

On January 14, 2000, Pay Less Super Markets assigned to Pay Less Holdings, Inc. its rights to the lease from SES, now owned by Kimco, and in the sub-lease with H.H. Gregg. Thereafter, Pay Less Holdings assigned its rights to both the lease and sub-lease to Tippecanoe.

In April of 2000, Target moved out of its space at the shopping center, leaving nearly half of the shopping center space unoccupied. In November 2000, Kimco mass-mailed a solicitation to several hundred prospective tenants. Kimco also attempted to find a tenant through advertisements, attendance at trade shows, and contact with other prospective tenants. The only prospective tenant Kimco located is Schnucks, a Missouri corporation that operates grocery stores. Kimco and Schnucks reached a tentative agreement regarding the essential terms of a lease for the space previously rented by Target.

On December 6, 2001, Kimco filed a complaint asking the trial court to declare unenforceable the restrictive covenant in Tippecanoe's lease that prohibits Kimco from renting space in the shopping center

to a grocery store. After a hearing, the trial court granted Kimco's request and declared the restrictive covenant unenforceable. Tippecanoe appeals. Additional facts relevant to each issue will be provided below.

## DISCUSSION AND DECISION

### 1. *Recusal*

Tippecanoe asserts the trial judge erred when he did not recuse himself.[3] Tippecanoe claims the judge abused his discretion by denying its motion for recusal based on an historical conflict of interest and by failing to recuse himself *sua sponte* because his campaign manager is affiliated with the law firm representing Kimco.

A trial court judge must "hear and decide matters assigned to the judge except those in which disqualification is required." Ind. Judicial Conduct Canon 3(B)(1). However, judges also have a duty to promote public confidence in the impartiality and integrity of the judiciary. Jud. Canon 2(B). Accordingly, the code requires a judge to "disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Jud. Canon 3(E).

 The test for disqualification under that canon is "whether an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality." *Tyson v. State*, 622 N.E.2d 457, 459 (Ind.1993). "The question is not whether the judge's impartiality is impaired in fact, but whether there exists a reasonable basis for questioning a judge's impartiality." *Id.* In Indiana, we prefer to err on the side of unnecessary recusal. *See id.* at 460 ("Indiana practice has always leaned toward recusal where reasonable questions about impartiality exist.... [I]n a close case where impartiality might reasonably be questioned, a judge must recuse.").

 Nevertheless, timeliness is important when a party requests recusal. *Id.* As with most other issues, counsel may not wait until after the court rules unfavorably on the merits to raise concerns about a judge's impartiality. *Id.* In fact, on more than one occasion we have held that a party has waived any argument regarding a judge's impartiality by failing to raise the issue in a timely manner. *See, e.g., Inlow v. Henderson, Daily, Withrow & DeVoe*, 787 N.E.2d 385, 400 (Ind.Ct.App. 2003), *trans. denied* 804 N.E.2d 756 (Ind. 2003); *Southwood v. Carlson*, 704 N.E.2d 163, 167–68 (Ind.Ct.App.1999) (party waived objection to judge's failure to recuse *sua sponte* where party failed to raise relationship between judge and one witness until after summary judgment granted for other party).

The facts in this case are similar to the facts in *Inlow*, where the Inlow children failed to question the judge's impartiality until they appealed the trial court's dismissal of their amended complaint. *Inlow*, 787 N.E.2d at 400. On appeal, the Inlows claimed the trial judge's impartiality could reasonably be questioned because the judge received campaign contributions from Henderson Daily and three individual attorneys at Henderson Daily. In addition, the treasurer of the judge's campaign committee was an attorney at the law firm that represented another party in the action. We denied the Inlows' request to

---

**3.** Tippecanoe frames this issue as whether the "judge violated Ind. Judicial Conduct Canons 1, 3(E)(1)(a), 3(B)(2), and (2)(A)(B) and should have recused himself." (Appellant's Br. at 27.) Because our supreme court has exclusive jurisdiction over the discipline of judges, *see* Ind. Appellate Rule 4(B)(2), we address only whether the trial judge abused his discretion.

reverse and remand for a change of judge, noting the Inlows "fail to explain what prevented them from discovering [the contributions and treasurer's identity] in time to bring it before the dismissal was granted or at the very least before the case was fully briefed on appeal." *Id.*

■ On appeal, Tippecanoe argues:

> Prior to and at the time of trial in the instant case, the trial court judge was sitting as an interim judge running for election. [Tippecanoe] did not learn until after trial that James McGlone, the former managing partner and an active "of counsel" attorney for Kimco's trial counsel was the campaign manager for the judge, and at no time prior to or during trial, did the judge ever notify counsel of the same.

(Appellant's Br. at 28.) Tippecanoe has not explained why it was unable to learn this information before the trial court ruled in favor of Kimco, and this argument is waived. *See Inlow,* 787 N.E.2d at 400.

■ Tippecanoe's other ground for error is that the trial court abused its discretion by denying Tippecanoe's motion for recusal based on an historical conflict of interest. Tippecanoe indicates the judge was a partner at a law firm that represented Tippecanoe County. In 1986, Tippecanoe County, and thus someone at the judge's prior law firm, reviewed a request by TA–I for dedication of a drainage ditch to allow development of a shopping center, "Tippy Court," which is within two miles of the Sagamore Shopping Center. Tippecanoe argues:

> Although it was not clear from the petition and order what was discussed at the meetings, by necessity it had to include TA–I's development of Tippy Court. TA–I's original motivation in developing Tippy Court was relevant at trial because it pertained to TA–I's reliance on

TA–II's restrictive covenant at the [Sagamore Shopping Center].

(Appellant's Br. at 29.)

A judge is presumed by law to be unbiased and unprejudiced. To overcome this presumption, the party seeking to disqualify a judge must establish actual personal bias. A mere allegation of bias, without a specific factual showing in support, is insufficient to require disqualification. Adverse rulings are insufficient to show bias per se. Upon review of a judge's failure to recuse, we will assume that the judge would have complied with the obligation to withdraw had there been any reasonable question concerning impartiality, unless we discern circumstances which support a contrary conclusion.

*Hite v. Haase,* 729 N.E.2d 170, 176 (Ind. Ct.App.2000) (internal citations and quotes omitted). Tippecanoe's allegations of bias are not supported by sufficient evidence to overcome our presumptions that Judge Busch was unbiased and that he would have recused himself if his impartiality was questionable.

### 2. *Restrictive Covenant*

■ Tippecanoe claims the trial court erred by concluding the restrictive covenant was unenforceable and Kimco could place a grocery store in the shopping center. Because the trial court entered numerous findings of fact and conclusions of law, we review its decision at two levels. *Oil Supply Co., Inc. v. Hires Parts Serv., Inc.,* 726 N.E.2d 246, 248 (Ind.2000). First, we determine whether the evidence supports the findings, and then we determine whether the findings support the judgment. *Id.* We may not reweigh the evidence or assess the credibility of witnesses. *Id.* Rather, we consider only the evidence favorable to the trial court's judgment. *Id.* We may reverse only if the

findings or judgment are clearly erroneous. *Id.*

 Generally speaking, covenants are agreements to do, or not to do, a particular act. *Columbia Club, Inc. v. Am. Fletcher Realty Corp.*, 720 N.E.2d 411, 417 (Ind.Ct.App.1999), *trans. denied* 735 N.E.2d 229 (Ind.2000). They typically arise in conveyances or other instruments related to real property. *Id.* Covenants can be negative, affirmative, or restrictive. *Id.* at 418. Negative covenants *prohibit* one of the parties from doing some act, while affirmative covenants *require* one of the parties to perform some act. *Id.* Restrictive covenants prohibit one of the parties from using the property in a particular manner. *Id.*

 Covenants create rights and duties between the original promising parties, because one party receives the "benefit" of the covenant, while the other party carries the "burden." *Id.* The benefit and burden of the covenant can be "personal" or can "run with the land." *Id.* A covenant is personal if it "is enforceable only by the original parties to an agreement." *Id.* A covenant that runs with the land, or "real covenant," can be enforced against the original parties and any remote grantees. *Id.* A covenant runs with the land if: (1) the original contracting parties intended it to run with the land; (2) the covenant "touches and concerns the land;" and (3) "there is privity of estate between subsequent grantees of the covenantor and covenantee." *Id.*

Tippecanoe and Kimco agree, and the trial court found, the covenant at issue is a restrictive covenant that runs with the land. Everyone also agrees that permitting Kimco to place a Schnucks grocery store in the old Target space would violate that restrictive real covenant. Based on these facts, the trial court concluded: "Because the provision of the Lease at issue is unambiguous, it must be enforced, unless equity compels a contrary conclusion." (Appellant's App. at 566.)

 Covenants restricting the use of land are "looked upon with disfavor," *Bagko Dev. Co. v. Damitz*, 640 N.E.2d 67, 70 (Ind.Ct.App.1994), because we have a "public policy in favor of the free use of land." Ind. Law Encyclopedia, *Covenants* § 7 (West 1971 & supp.2002) [hereinafter, *"Covenants"*]. However, equity requires us to enforce restrictive covenants "when 'the restrictions are unambiguous and do not violate public policy.'" *Bagko*, 640 N.E.2d at 67 (quoting *Hrisomalos v. Smith*, 600 N.E.2d 1363, 1366 (Ind.Ct.App. 1992)). Covenants that restrict business activity generally do not violate public policy.[4] *Covenants* § 7 (citing *Ferris v. Am. Brewing Co.*, 155 Ind. 539, 58 N.E. 701 (1900)).

██ Nevertheless, a covenant that did not originally violate public policy can begin to violate public policy if the surrounding area changes in ways that "are so radical in nature that the original purpose of the covenant has been defeated." *Cunningham v. Hiles*, 182 Ind.App. 511, 395 N.E.2d 851, 854 (1979), *opin. modified by* 402 N.E.2d 17 (Ind.Ct.App.1980) (modifying order on remand due to completion during appeal of building appellee was enjoined from building). The Indiana Law Encyclopedia explains:

> If the conditions that made the covenant feasible at one time no longer exist, the courts will not enforce the covenant.

---

4. Covenants that violate public policy are, for example, those that restrict land from being sold to persons of a different race. *See Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (state court cannot enforce a restrictive covenant prohibiting occupancy or ownership of property by African–Americans).

Changed conditions rendering a covenant substantially inapplicable to the new set of circumstances may operate to terminate the covenant, as where changes occur in the neighborhood so radical in character as to defeat the purpose of a restrictive covenant, but where the change is not so fundamental, it will remain in full force and effect.

*Covenants § 7.*

■■■ A determination whether a restrictive covenant is enforceable must be made on a case-by-case basis. *Cunningham,* 395 N.E.2d at 855. There is "no hard and fast rule" regarding when the changes are sufficient. *Id.* (quoting *Bachman v. Colpaert Realty Corp.,* 101 Ind. App. 306, 319–20, 194 N.E. 783, 789 (1935)). In determining whether radical changes have occurred, we may consider changes outside the restricted area, but "the weight attributed to these changes should not be as great as that accorded changes which have occurred within the restricted area." *Id.*

In this case, the trial court found the covenant unenforceable because "[t]he use of the property and the surrounding area have changed so radically, however, that the original purpose of the covenant can no longer be achieved." (Appellant's App. at 570.) The facts cited by the trial court to support the radical change of circumstances are: (1) Tippecanoe no longer uses the Kroger space for a grocery store; (2) Tippecanoe's lessee is an appliance store who will not be impacted by a grocery store; and (3) "Target, the major anchor of the Shopping Center, has departed." (*Id.*) Accordingly, we must determine whether the three circumstances found by the trial court constitute changed circumstances so radical and fundamental they defeat the purpose of the restrictive covenant.

■■■ A majority of the Indiana case law regarding changed circumstances and restrictive covenants involves deeds containing covenants that prohibit lots from being used for other than residential purposes. In all of those cases, we have held the changes were insufficient to defeat the original purpose of the covenant and the covenants were enforceable. *See Hrisomalos v. Smith,* 600 N.E.2d 1363, 1367 (Ind.Ct.App.1992) (two changed circumstances found by trial court, specifically the opening of a chiropractic office and erection of a church, did not support invalidation of restrictive covenant when trial court did not find those changes altered the character of the neighborhood or threatened the purpose of the covenant); *Burnett v. Heckelman,* 456 N.E.2d 1094, 1099 (Ind.Ct.App.1983) (changes were not so radical to make the original purpose of the covenant no longer feasible, where sizes of lots on edge of restricted subdivision were reduced by eminent domain to widen the highway and the area around the restricted subdivision had become much more commercial, because subdivision had maintained its residential character); *Cunningham,* 395 N.E.2d at 855–56 (commercial building encroaching 112.5 feet into subdivision at northeast corner and other commercial buildings being adjacent to the subdivision did not change the essential character of the subdivision from the residential use required by the restrictive covenant); *Bob Layne Contractor, Inc. v. Buennagel,* 158 Ind.App. 43, 60–61, 301 N.E.2d 671, 682 (1973) (installation of a four-lane highway just north of the subdivision did not constitute a change in circumstances so radical that the restrictive covenant was no longer enforceable); *Bachman,* 101 Ind.App. at 320, 194 N.E. at 789 (rezoning of lots from residential to commercial was not sufficient to defeat the purpose of the deed restriction that the lots were for residential use only).

In *Sorrentino v. Cunningham*, a landowner, Sorrentino, had a restaurant that served beer and wine in "the Original Town of Irvington, which is now a part of the City of Indianapolis." 111 Ind.App. 212, 215, 39 N.E.2d 473, 475 (1942). The original plat of the Town of Irvington contained a restriction prohibiting subsequent landowners from selling "intoxicating beverages except for sacramental, medicinal or mechanical purposes." *Id.* A group of landowners sued to enforce the restriction.

Sorrentino claimed Irvington had changed so substantially since its incorporation that the restriction was no longer enforceable. The facts he cited were that a strip of East Washington Street in Irvington had developed from a residential district into a business district, that the business district on Washington Street continued outside the area platted as Irvington, and that near Irvington on Washington Street were "several taverns." *Id.* at 222, 39 N.E.2d at 477. In addition, drug stores in Irvington sold package beer and liquor and some grocery stores in Irvington sold package beer. The evidence also suggested that prohibiting Sorrentino from selling alcohol would depreciate the value of his property by $12,000.

Nevertheless, the trial court found those changes were not sufficiently significant to allow Sorrentino to ignore the restrictive covenant. When affirming, we noted the covenant was "for the benefit of all the people who own lots within the restricted area" and "was calculated as a benefit to the public health and morals of the community." *Id.* at 223, 39 N.E.2d at 478. Accordingly, we held the changes Sorrentino cited had not changed Irvington so radically that they had destroyed "the essential objects and purposes of the agreement." *Id.* (quoting *Bachman*, 101 Ind. App. at 319, 194 N.E. at 789).

We have found only one Indiana decision in which an appellate court held a restrictive covenant unenforceable based on a change in circumstances. *See Am. Cannel Coal Co. v. Ind. Cotton Mills*, 78 Ind.App. 115, 134 N.E. 891 (1922). In 1849, a coal company sold a portion of real estate to a cotton mill by a deed that prohibited the cotton mill from using certain portions of the land it purchased, including an area adjacent to the river that was to be left open for a public promenade. *Id.* at 117, 134 N.E. at 892. In 1918, the cotton mill began erecting a building that encroached into the area reserved for a promenade, and the coal company requested an injunction. We noted the coal company would not suffer any injury by the cotton mill's violation of the restriction. *Id.* at 122, 134 N.E. at 893. In addition, because sixty-nine years had passed since the restriction was put in place, during which time industries had grown substantially, we believed, "[t]o hold, in view of this development, that the parties to the deed intended after these years to hamper the cotton mill to its original installation, is to hold that they were wholly without vision." *Id.* at 123, 134 N.E. at 893. For those reasons, we declined to enforce the covenant.

The facts here are distinguishable from the facts in *American Cannel Coal* in one very important respect: Tippecanoe will suffer injury if Kimco is permitted to violate the restrictive covenant. As the trial court noted, Tippecanoe's lessee at the shopping center, H.H. Gregg, would not be injured because the appliance store would not compete with Schnucks grocery store. Nevertheless, the owners of Tippecanoe own other companies that own grocery stores in close proximity to the shopping center, and based on the evidence submitted by Tippecanoe, Schnucks would compete with those other stores.

One of the main purposes of restrictive covenants is to "maintain or enhance the value of land 'by controlling the nature and use of lands subject to a covenant's provisions.'" *Grandview Lot Owners Ass'n, Inc. v. Harmon,* 754 N.E.2d 554, 557 (Ind. Ct.App.2001) (quoting *Campbell v. Spade,* 617 N.E.2d 580, 583 (Ind.Ct.App.1993)). It seems apparent to us that the value to Tippecanoe of the lease for the Kroger space at the shopping center was based not only on the fact that Tippecanoe could sublease that space to another company, but also on the fact that, by enforcing the restrictive covenant, Tippecanoe could avoid grocery store competition in that neighborhood. Thereby, the restrictive covenant enhanced the value of the land for Tippecanoe.

■ Furthermore, diminution in value is not sufficient justification for declaring a restrictive covenant unenforceable. *Burnett,* 456 N.E.2d at 1099. In that case we explained:

> We are not unsympathetic to [appellee]'s plight. However, as she acknowledges, the lots were purchased with full knowledge of the covenants and their import with respect to her rights as well as the rights of other lot owners. To permit [appellee] to ignore the covenants now that her property could be more profitably used for commercial purposes would certainly be to her benefit. It would, however, be to the detriment of the other lot owners who purchased their property in reliance upon the restrictive covenants, and who, in light of the absence of any change within the subdivision, have every right to expect it will retain its residential character.

*Id.*

Nor are we unsympathetic to Kimco's plight. It has not yet found a suitable, non-grocery, business to lease the old Target space, and it presumably is losing money. However, Kimco does not claim lack of knowledge about the covenant at the time it purchased the property from SES. But to ignore the covenant for the benefit of Kimco would be detrimental to Tippecanoe's owners, who purchased the property with knowledge of the covenant and presumably in reliance thereon. The property's loss of value for Kimco is not a sufficient reason to set aside the restrictive covenant. *See id.*

Based on our review of Indiana caselaw, we do not believe the three changes cited by the trial court are sufficient to support invalidating the restrictive covenant in the lease between Kimco and Tippecanoe. *See, e.g., Klefstad Cos., Inc. v. New Boston Allison Ltd. Partnership,* 2000 WL 1469701 \* 6 (S.D.Ind.) (noting, under Indiana law, "courts should be wary of invalidating restrictive covenants based solely on changes in the areas covered by the covenants" and courts should enforce the restrictions because "the benefits of the covenant could still be realized by other property owners in the area"). Those three changes do not destroy "the essential objects and purposes of" the covenant. *See Sorrentino,* 111 Ind.App. at 223, 39 N.E.2d at 478. Accordingly, we reverse the trial court's declaratory judgment in favor of Kimco.[5]

Affirmed in part and reversed in part.

DARDEN, J., and BARNES, J., concur.

---

**5.** Because we find the restrictive covenant enforceable, we need not address Tippecanoe's Fifth Amendment argument.