**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 18, 2007

BLOOMFIELD ESTATES IMPROVEMENT
ASSOCIATION, INC.,

    Plaintiff-Appellee,

v                                    No. 130990

CITY OF BIRMINGHAM,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal to consider: (1) whether the use of a park as a "dog park" violates a deed restriction limiting use of the land to "residential purposes only"; and (2) whether a plaintiff has waived the ability to challenge a violation of a deed restriction when the plaintiff has failed to challenge less serious violations of the deed restriction in the past. We affirm the judgment of the Court of Appeals that use of land for a "dog park" violates a deed restriction limiting use of the land to "residential purposes only." Moreover, we also affirm the judgment of the Court of Appeals that a plaintiff may contest a "more serious" violation of a

deed restriction, even if such plaintiff has not contested less serious violations of the deed restriction in the past. Accordingly, we remand this case to the trial court for the entry of an order of summary disposition in favor of plaintiff, and for a determination of the appropriate remedy.

## I. STATEMENT OF FACTS

In 1915, the Bloomfield Estates Company recorded deed restrictions on lots in the Bloomfield Estates subdivision. Among the lots on which the deed restrictions were imposed was Lot 52, which is the lot at issue in this case. Around 1928, Bloomfield Township purchased Lot 52 and other restricted subdivision lots pursuant to a plan to create a park. In 1929, a complaint was filed by the Bloomfield Township Board of Trustees to remove these deed restrictions, but the complaint was later voluntarily dismissed. In 1938, defendant city of Birmingham was deeded the restricted lots being used as a park, including Lot 52. The quitclaim deeds were "subject to the building and use restrictions of record." This land was incorporated into Springdale Park, a 55-acre park administered by defendant city. Only a portion of Springdale Park is burdened by the deed restriction at issue in this case. In 1941, plaintiff association was formed to enforce the deed restrictions on behalf of landowners in the Bloomfield Estates subdivision. The Bloomfield Estates Company quitclaimed its remaining rights to plaintiff in 1955.

Springdale Park has been used over the years for a variety of park-related activities, including those that might be characterized as involving unusual

2

amounts of noise. For example, the park has been used for dances, Girl Scout camping, and baseball games. However, the Girl Scout camping and the dances did not occur on land burdened by the deed restrictions. Although baseball games took place on lots burdened by the deed restrictions in 1947, plaintiff requested that defendant cease allowing baseball games on these lots. Defendant responded by stating that "restrictions will be placed on the use of the park," and "it is not our intent to use Lots 57 and 58 for baseball games." Another 1947 letter challenged a building on Lot 42 that violated the deed restrictions, and defendant responded by stating that it would remove the building. In 1951, plaintiff again challenged the use of restricted lots for baseball games and the presence of a maintenance building on a restricted lot. Defendant responded by noting that baseball had not been played on the property for 12 months, and that defendant would "remove this [maintenance] building from this lot." Although plaintiff has challenged violations of the deed restrictions occurring on restricted lots of the park, plaintiff has never challenged the use of the lots as a park.

In 2003, plaintiff became aware that defendant planned to use Lot 52 of Springdale Park as a "dog park," a fenced area within which dogs could roam unleashed. Plaintiff alerted defendant that plaintiff would enforce its rights under the deed restriction if the dog park was built. In 2004, defendant built the dog park. At the time the dog park was erected, dogs were not allowed in Springdale Park, and signs indicated that dogs were prohibited. Plaintiff filed suit against defendant, seeking enforcement of the deed restriction and injunctive relief against

3

use of Lot 52 as a dog park. Plaintiff also asked the trial court to order defendant to tear down the fence.

Defendant moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff had waived its right to enforce the deed restriction, and that the use of Lot 52 as a dog park did not violate the deed restriction. The trial court granted summary disposition to defendant. The trial court ruled that plaintiff had not waived its right to enforce the deed restriction through acquiescence; however, the trial court also concluded that the deed restriction was not violated, because the use of Lot 52 as a dog park constituted a "residential" use.

Plaintiff appealed to the Court of Appeals, and the Court of Appeals reversed in a split decision. Unpublished opinion per curiam of the Court of Appeals, issued March 14, 2006 (Docket No. 255340). The Court of Appeals determined that "reference to dictionary definitions shows that the restriction did not contemplate using the property as a park." *Id*., slip op at 3. Consequently, "[u]se of Lot 52 as part of a municipal park violates the deed restriction irrespective of whether part of it is fenced off as a dog park." *Id*. Because the lots had been used as a park for 75 years, "equity will no longer permit plaintiff to seek enforcement of the deed restriction against that use." *Id*., slip op at 4. However, plaintiff could "challenge more serious or more extensive violations." *Id*., citing *Boston-Edison Protective Ass'n v Goodlove*, 248 Mich 625, 629-630; 227 NW 772 (1929). Because the dog park constituted a "more serious violation of the deed restrictions," plaintiff could challenge that use. *Id*. Consequently, the Court of

4

Appeals found that the trial court erred in granting summary disposition for defendant. The Court of Appeals reversed the trial court and remanded for the entry of an order of summary disposition in favor of plaintiff. It also remanded for the trial court to determine if an injunction was warranted under these circumstances.

The dissenting judge would have held that plaintiff could not object to the use of Lot 52 as a dog park, because "common sense would . . . suggest that while [Lot 52] has been a park for the past seventy-five years, people have brought their dogs to this park." *Id.*, slip op at 2. For that reason, the use of Lot 52 as a dog park did not constitute a "'more serious violation of the deed restrictions.'" *Id.* We granted defendant's application for leave to appeal. 477 Mich 958 (2006).

## II. STANDARD OF REVIEW

We review de novo the grant or denial of a motion for summary disposition. *Saffian v Simmons*, 477 Mich 8, 12; 727 NW2d 132 (2007). The scope of a deed restriction is a question of law that is reviewed de novo. *Terrien v Zwit*, 467 Mich 56, 60-61; 648 NW2d 602 (2002).

## III. ANALYSIS

## A. VIOLATION OF DEED RESTRICTION

A deed restriction represents a contract between the buyer and the seller of property. *Uday v City of Dearborn*, 356 Mich 542, 546; 96 NW2d 775 (1959). "Undergirding this right to restrict uses of property is, of course, the central vehicle for that restriction: the freedom of contract, which is . . . deeply entrenched

5

in the common law of Michigan." *Terrien*, *supra* at 71 n 19, citing *McMillan v Mich S & N I R Co*, 16 Mich 79 (1867). The United States Supreme Court has listed the "right to make and enforce contracts" among "those fundamental rights which are the essence of civil freedom." *United States v Stanley*, 109 US 3, 22; 3 S Ct 18; 27 L Ed 835 (1883). We "respect[] the freedom of individuals freely to arrange their affairs via contract" by upholding the "fundamental tenet of our jurisprudence . . . that unambiguous contracts are not open to judicial construction and must be *enforced as written*," unless a contractual provision "would violate law or public policy." *Rory v Continental Ins Co*, 473 Mich 457, 468, 470; 703 NW2d 23 (2005) (emphasis in original). As one court has stated:

> Courts do not make contracts for parties. Parties have great freedom to choose to contract with each other, to choose not to do so, or to choose an intermediate course that binds them in some ways and leaves each free in other ways. [*Rarities Group, Inc v Karp*, 98 F Supp 2d 96, 106 (D Mass, 2000).]

"'Were courts free to refuse to enforce contracts as written on the basis of their own conceptions of the public good, the parties to contracts would be left to guess at the content of their bargains . . . .'" *Fed Deposit Ins Corp v Aetna Cas & Surety Co*, 903 F2d 1073, 1077 (CA 6, 1990), quoting *St Paul Mercury Ins Co v Duke Univ*, 849 F2d 133, 135 (CA 4, 1988). Because the parties have freely set forth their rights and obligations toward each other in their contract, when resolving a contractual dispute, "society is not motivated to do what is fair or just in some abstract sense, but rather seeks to divine and enforce the justifiable expectations of the parties as determined from the language of their contract." *Rich Products*

*Corp v Kemutec, Inc*, 66 F Supp 2d 937, 968 (ED Wis, 1999).  Rather than attempt to apply an abstract notion of "justice" to each particular case arising out of a contract, we recognize that refusal to enforce a contract is "contrary to the real justice as between [the parties]."  *Mitchell v Smith*, 1 Binn 110, 121 (Pa, 1804).  See also *Brown v Vandergrift*, 80 Pa 142, 148 (1875) (holding that enforcing a contract is "essential to do justice").  Consequently, when parties have freely established their mutual rights and obligations through the formation of unambiguous contracts, the law requires this Court to enforce the terms and conditions contained in such contracts, if the contract is not "contrary to public policy."[1]  *Sands Appliance Services, Inc v Wilson*, 463 Mich 231, 239; 615 NW2d 241 (2000).  When contracts are formed, the parties to the contract are the lawmakers in such realm and deference must be shown to their judgments and to their language as with regard to any other lawmaker.

Because of this Court's regard for parties' freedom to contract, we have consistently "support[ed] the right of property owners to create and enforce covenants affecting their own property."  *Terrien*, *supra* at 71.  Such deed restrictions "'generally constitute a property right of distinct worth.'"  *Rofe v Robinson*, 415 Mich 345, 350; 329 NW2d 704 (1982), quoting *Cooper v Kovan*, 349 Mich 520, 531; 84 NW2d 859 (1957).  Deed restrictions "'preserve not only

---

[1] Defendant has not attempted to show that the deed restriction violated public policy; indeed, we have consistently supported the right of property owners to form deed restrictions.  See *Terrien*, *supra* at 71.

monetary value, but aesthetic characteristics considered to be essential constituents of a family environment.'" *Rofe v Robinson (On Second Remand)*, 126 Mich App 151, 157; 336 NW2d 778 (1983), quoting *Bellarmine Hills Ass'n v Residential Systems Co*, 84 Mich App 554, 559; 269 NW2d 673 (1978).  If a deed restriction is unambiguous, we will enforce that deed restriction as written unless the restriction contravenes law or public policy, or has been waived by acquiescence to prior violations, because enforcement of such restrictions grants the people of Michigan the freedom "freely to arrange their affairs" by the formation of contracts to determine the use of land.  *Rory*, *supra* at 468.  Such contracts allow the parties to preserve desired "aesthetic" or other characteristics in a neighborhood, which the parties may consider valuable for raising a family, conserving monetary value, or other reasons particular to the parties.

The deed restriction at issue here states:

> Each lot or lots shall be used for *strictly residential purposes only*, and no buildings except a single dwelling house and the necessary out-buildings shall be erected or moved upon any lot or lots except that Lot 1 may be used for four dwelling houses and the necessary out-buildings, and that three houses may be erected on Lots 40 and 41.  [Emphasis added.]

At issue then is the meaning of the phrase "strictly residential purposes only." Although the deed restriction does not define "residential," where a term is not defined in a contract, "we will interpret such term in accordance with its 'commonly used meaning.'"  *Terrien*, *supra* at 76-77, quoting *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 354; 596 NW2d 190 (1999).  Moreover,

8

under the doctrine of *noscitur a sociis*, "'a word or phrase is given meaning by its context or setting.'" *Koontz v Ameritech Services, Inc*, 466 Mich 304, 318; 645 NW2d 34 (2002), quoting *Brown v Genesee Co Bd of Comm'rs (After Remand)*, 464 Mich 430, 437; 628 NW2d 471 (2001).

The deed restriction limits the use of restricted land to "strictly residential purposes only." The term "residential" means "pertaining to residence or to residences." *Random House Webster's College Dictionary* (1997). "Residence" means "the place, esp[ecially] the house, in which a person lives or resides; dwelling place; home." *Id*. The term "residential" in the deed restriction thus refers to homes where people reside. By using the terms "strictly" and "only," the deed restriction seeks to underscore or emphasize that restricted land may only be used for this purpose.

This conclusion is bolstered by the remaining language in the deed restriction, which states that "no buildings except a single dwelling house and the necessary out-buildings shall be erected or moved upon any lot or lots." This language indicates that when the deed restriction refers to "residential purposes," the intended use is as a "single dwelling house" and immediately related purposes. The only exceptions listed-- "that Lot 1 may be used for four dwelling houses and the necessary out-buildings, and that three houses may be erected on Lots 40 and 41"-- further clarify that the term "residential" refers to a "single dwelling house." Neither of the two listed exceptions allows for use of Lot 52 as a park. Therefore,

9

the phrase "strictly residential purposes only" precludes use of Lot 52 as a park and such use violated the deed restriction.

Because use of the restricted land as a park violated the deed restriction, the use of Lot 52 as a dog park violated the deed restriction as well. Our prior holdings support this conclusion. Cf. *Wood v Blancke*, 304 Mich 283, 288-289; 8 NW2d 67 (1943) (The raising of 40 carrier pigeons for private use did not constitute use for "residence purposes."). Defendant argues that the deed should be construed to allow a broad range of activity to be considered "residential." Although our courts have noted that "[a] restriction allowing residential uses permits a wider variety of uses than a restriction prohibiting commercial or business uses," *Beverly Island Ass'n v Zinger*, 113 Mich App 322, 326; 317 NW2d 611 (1982), those cases have concerned a landowner who was using his or her home for business purposes *in addition to residential use*. In *Beverly*, the Court of Appeals permitted a homeowner to run a small day care facility from her home because this use was indistinguishable from the use resulting if the homeowner "simply ha[d] a large family."[2] *Id*. at 328. In *Miller v Ettinger*, 235 Mich 527; 209 NW 568 (1926), we allowed a landowner burdened by a restriction that the land be used "solely for residence purposes" to build an apartment building on the land. Here, Lot 52 is being used as a park, and prospectively as a dog park.

---

[2] Cf. *Terrien*, *supra* at 60, which held that use of land as a day care center was not permitted under a deed restriction that prohibited use of the land "'for any commercial, industrial, or business enterprises.'"

Neither of these uses involves the use of Lot 52 as a dwelling place, and consequently these uses do not conform to the deed restriction.

Defendant further argues that using the land to allow dogs to roam constitutes a "residential" use because homeowners may allow dogs to wander in their own backyards under "residential purposes only" restrictions. However, the instant case is distinguishable from the backyard scenario. Most importantly, a backyard is attached to a home, and hence fits within the actual meaning of the term "residential." That is, a backyard is an extension of a residence. A dog park is not attached to a home, and hence does not accord with the meaning of the term "residential." Moreover, a dog park lacks two characteristics of a backyard, which suggests that a dog park is not included within the commonly understood meaning of "residential" use. First, because a backyard is attached to a home, the master exercises some level of control over the backyard. Here, no one person controls the dog park. Second, the dog park may permit use by a great multitude of dogs at one time, while a backyard generally contains at most a few dogs.[3] These characteristics sufficiently distinguish a dog park from the meaning normally

---

[3] Moreover, the number of dogs in a yard may be limited by local ordinance, while the dog park in this case had no limits on the number of dogs permitted.

ascribed to "residential" use, thereby indicating that the dog park violates the deed restriction limiting Lot 52 to "residential" use.[4]

Thus, use of Lot 52 as both a park and a dog park violates the deed restriction, which limits the use of the land to "residential purposes only."

## B. CONTESTING USE OF LOT 52

Defendant argues that, even if the deed restriction was violated by use of Lot 52 as a dog park, plaintiff cannot enforce the deed restriction in light of its acquiescence to prior violations of the deed restriction. That is, defendant contends that the deed restriction was effectively waived.

> With regard to whether a restriction has been waived, we likewise have said that "whether or not there has been a waiver of a restrictive covenant or whether those seeking to enforce the same are guilty of laches are questions to be determined on the facts of each case as presented." [*Id*., quoting *Grandmont Improvement Ass'n v Liquor Control Comm*, 294 Mich 541, 544; 293 NW 744 (1940).]

We have found that waiver did not occur if a plaintiff "promptly filed" suit "[w]hen it became apparent to plaintiff that the owner of [a restricted lot] was

---

[4] Defendant and the dissent argue that we should construe the deed restriction in light of the applicable zoning ordinances, citing *Brown v Hojnacki*, 270 Mich 557, 560-561; 259 NW 152 (1935). However, we later said that *Brown* confirmed the rule that "*ambiguous* restrictions may be interpreted in the light of a general plan." *Smith v First United Presbyterian Church*, 333 Mich 1, 8; 52 NW2d 568 (1952) (emphasis added). Because the deed restriction in this case is not ambiguous, consideration of the zoning ordinances is not necessary. Defendant and the dissent further argue that the deed restriction should be construed in favor of the free use of property. See *O'Connor v Resort Custom Builders, Inc*, 459 Mich 335, 341-342; 591 NW2d 216 (1999). However, this rule "should not be applied in such a way as to defeat the plain and obvious purposes of a contractual instrument or restriction." *Brown*, *supra* at 560.

about to use it for commercial purposes [in violation of a deed restriction]." *Baerlin v Gulf Refining Co*, 356 Mich 532, 536; 96 NW2d 806 (1959). Defendant asserts that plaintiff's failure to "promptly file" suit to preclude the use of Lot 52 as a park effectively waived plaintiff's ability to contest the use of Lot 52 as a dog park.

Plaintiff argues, however, that though it has never contested the use of Lot 52 as a park, it may still contest the proposed use of Lot 52 as a dog park. In *Jeffrey v Lathrup*, 363 Mich 15; 108 NW2d 827 (1961), we stated the general rule that if a plaintiff has not challenged previous violations of a deed restriction, the restriction "does not thereby become void and unenforceable when a violation of a *more serious and damaging degree occurs*." *Id*. at 22 (emphasis added). See also *Sheridan v Kurz*, 314 Mich 10, 13; 22 NW2d 52 (1946); *Cherry v Bd of Home Missions of Reformed Church in United States*, 254 Mich 496, 504; 236 NW 841 (1931); *Goodlove, supra* at 629 ("Plaintiffs are not estopped from preventing a most flagrant violation of the restrictions on account of their theretofore failure to stop a slight deviation from the strict letter of such restrictions."). When determining whether prior acquiescence to a violation of a deed restriction prevents a plaintiff from contesting the current violation, we compare the character of the prior violation and the present violation. Only if the present violation constitutes a "more serious" violation of the deed restriction may a plaintiff contest the deed restriction despite the plaintiff's acquiescence to prior violations of a less serious character. In general, a "more serious" violation occurs when a

particular use of property constitutes a more substantial departure from what is contemplated or allowable under a deed when compared to a previous violation. See, e.g., *Sheridan*, *supra* (holding that a more serious violation occurred when noise caused by a later violation represented a dramatic increase from noise caused by an earlier violation). That is, use that constitutes a "more serious" violation imposes a greater burden on the holder of a deed restriction than the burden imposed by a previous violation. Although determining whether a "more serious" violation occurred will hinge on the facts of a particular case, some relevant factors that may be considered include: (1) whether the later violation involved the erection of a structure where no such structure had previously been permitted;[5] (2) whether the later violation constituted a more extensive violation of restrictions on the size or extent of a building;[6] (3) whether the later violation increased the use of land from a sporadic violation of the restriction to a continuous violation;[7] (4) whether the later violation significantly increased the noise or pollutant level on restricted land;[8] (5) whether the later violation increased the level of traffic occasioned by the prior violation;[9] (6) whether the later violation permitted an

---

[5] See *Goodlove*, *supra*.

[6] See *Kelman v Singer*, 222 Mich 454; 192 NW 580 (1923).

[7] See *Woughter v Van Marter*, 281 Mich 408; 275 NW 236 (1937).

[8] See *Sheridan*, *supra*.

[9] *Id*.

action that had been previously prohibited; and (7) whether the later violation altered in some material respect the character of the use of the restricted property.[10]

The dog park constitutes a "more serious" violation of the deed restriction than the previous uses of Lot 52. First, the dog park includes a permanent structure-- an enclosed, fenced area-- on Lot 52. Before the dog park, no such structures existed on the restricted lots. Second, the dog park will create continuous and systematic use of Lot 52, whereas previously the use of the restricted lots was irregular and sporadic. Third, the dog park will affirmatively encourage people to bring their dogs to Lot 52. Before Lot 52 was used as a dog park, dogs were prohibited from the park by posted "No Dogs" signs. Hence, an activity that was once expressly *prohibited* is now *sanctioned* and *encouraged* by the creation of the dog park. Fourth, by encouraging more regular use of Lot 52, the dog park will generate more traffic in the surrounding neighborhoods than the previously irregular and sporadic use of the restricted lots. In summation, use of Lot 52 as a dog park effectively transforms the property from a vacant park to something akin to a public kennel. Consequently, this use constitutes a "more

---

[10] For example, if the later violation consisted of an "exclusively commercial" use of restricted land, such as a gas station, whereas prior violations consisted of commercial activity taking place within a residence, such as a home-based dressmaking or computer repair establishment, the later violation might well be determined to alter the character of the use of the restricted property. *Polk Manor Co v Manton*, 274 Mich 539, 541-543; 265 NW 457 (1936).

serious" violation of the deed restriction than the previous use as an open section of Springdale Park.

Because plaintiff has previously objected to "more serious" violations of the deed restrictions that also raised similar concerns of noise and the erection of permanent structures on restricted land, plaintiff has not, in our judgment, waived its ability to contest this "more serious" violation.

Defendant raises several arguments in opposition to the application of this rule. It argues that the park had previously been subject to noisy uses, and thus plaintiff acquiesced to noisy uses of the park, pointing to the park's previous use for overnight Girl Scout camping, large dances, and baseball on permanent baseball diamonds. However, these uses occurred in sections of the park that were *unburdened* by the relevant deed restrictions.[11] Defendant would thus require plaintiff to object to "violations" of the deed restriction that occurred on *unrestricted* land, i.e., land uses that simply did not violate deed restrictions. However, plaintiff would have no authority or basis on which to object to violations of deed restrictions that did not apply to the land on which the "violations" occurred. We have never imposed such an obligation on the holders of a restricted deed. See, e.g., *Brideau v Grissom*, 369 Mich 661, 667; 120 NW2d 829 (1963) (allowing the plaintiff property owners to enforce a deed restriction on

---

[11] As described earlier, plaintiff objected to use of the park for baseball games when those games occurred on lots burdened by the deed restrictions.

16

adjacent property even though the plaintiffs had not objected to similar violations that occurred several blocks away).[12]

Defendant also argues that allowing plaintiff to contest the dog park after acquiescing to the park itself will permit those with the right to enforce deed restrictions to "pick and choose" which violations will be tolerated. However, allowing a plaintiff to enforce a deed restriction against a "more serious" violation does not grant that plaintiff an unlimited right to "pick and choose" which violations to allow and which violations to contest. A plaintiff can only contest "more serious" violations of the relevant deed restriction. Therefore, a plaintiff who acquiesces to one violation is thereafter prevented from contesting violations of an equivalent nature. However, a plaintiff who acquiesces to a seemingly innocuous violation would not forever be prevented from challenging more serious violations.

---

[12] Citing *Goodlove*, *supra* at 629, defendant further argues that the original violation must have been a "slight deviation" from the deed restriction, and that the use of Lot 52 as a park was not a "slight deviation." But see contra *Jeffrey*, *supra* at 22 ("Where the restriction has been violated *in some degree*, it does not thereby become void and unenforceable when a violation of a more serious and damaging degree occurs.") (emphasis added); *Cherry*, *supra* at 504 ("[*T*]o the *extent* plaintiffs had for a long time acquiesced in defendant's violation of the restrictions they were estopped from asking injunctive relief.") (emphasis added). Moreover, the facts in *Sheridan*-- in which the prior violation consisted of the owner's operation of an engine repair business in a garage-- could hardly be considered a "slight deviation" from a "residence purposes only" deed restriction. Hence, the touchstone of the rule regarding waiver is the disparity between the prior and the present violations, and not the initial existence of a "slight deviation."

Defendant essentially proposes a rule that would require those with the right to enforce deed restrictions to challenge every arguable violation of the deed restrictions, even minor technical violations, in order to ensure that the deed restrictions retain their effect. A plaintiff "should not be impelled to engage in overzealous covenant enforcement fearing possible waiver of future enforcement rights." 2 Restatement Property, 3d, § 8.3, comment f, p 502. In this case, defendant's proposed rule would prevent plaintiff from challenging the use of Lot 52 for a zoo, a waterpark, or a motocross track. Adopting defendant's rule would create increasing chaos in the enforcement of deed restrictions.

## IV. RESPONSE TO THE DISSENT

The dissent first concludes that the dog park constitutes a "residential" use under the terms of the deed restriction. To reach this conclusion, instead of simply examining the language that the parties themselves employed, the dissent defines the terms in the deed restriction by considering how other states have construed altogether different deed restrictions.[13] This interpretative technique fails for two

---

[13] The dissent offers two reasons for its rejection of our interpretation of the deed restriction. First, the dissent relies on the proposition that "restrictive covenants are to be strictly construed against the party seeking to enforce them and all doubts resolved in favor of the free use of property." *Post* at 4. However, this rule is "'applicable only as a last resort, when other techniques of interpretation and construction have not resolved the question of which of two or more possible reasonable meanings the court should choose.'" *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 472-473; 663 NW2d 447 (2003) (citation omitted). Second, the dissent asserts that the majority "reduces to a redundancy the language prohibiting buildings other than single dwelling houses," *post* at 6, by concluding that the term "residential purposes only" in this particular deed refers

18

reasons. First, the intent of the parties is properly determined from the words used by the parties themselves, not from the decisions of foreign (or even Michigan) courts addressing different deeds containing different language. Second, the majority of the cases cited by the dissent involve deed restrictions that merely limit the use of property to "residential purposes," and hence are readily distinguishable.[14] Furthermore, *Baker v Smith*, 242 Iowa 606; 47 NW2d 810 (1951), merely held that a restriction limiting use to a "dwelling place" did not preclude use as an apartment building. The instant case obviously does not involve the use of Lot 52 as a residence in any form. See also *Isbrandtsen v North Branch Corp*, 150 Vt 575; 556 A2d 81 (1988) (restriction limiting use to "single-family residence purposes only" did not preclude an owner from inviting guests to spend the night).

After arguing that the dog park is a "residential" use, the dissent further concludes that, even if the dog park is not "residential," it does not constitute a

---

to a "single dwelling house." However, the dissent mischaracterizes this opinion. We first conclude that the term "residential" refers to a residence or a dwelling home. Only then, because the deed restriction explicitly limits the use of Lot 52 to a "single dwelling house," do we conclude that the deed restriction limits the use of Lot 52 to a "single dwelling house" and immediately related purposes. Hence, the dissent's assertion that we make the term "single dwelling house" a "redundancy" is completely without basis.

[14] See *Bagko Development Co v Damitz*, 640 NE2d 67 (Ind App, 1994); *Voedisch v Town of Wolfeboro*, 136 NH 91; 612 A2d 902 (1992); *Winn v Ridgewood Dev Co*, 691 SW2d 832 (Tex App, 1985); *Shermer v Haynes*, 248 Ark 255; 451 SW2d 445 (1970). The dissent fails to acknowledge that the deed restriction in this case limits the use of Lot 52 to a "single dwelling house," thereby making this case distinguishable from the cases cited.

"more serious" violation of the deed restriction. The dissent principally relies on *Cherry* to conclude that a "more serious" violation did not occur because a "dog park is of the same nature as a park." *Post* at 13. However, *Cherry* addressed whether a plaintiff could contest the defendant's erection of a new church on restricted land after the plaintiff had allowed the defendant to continuously operate a church building on the same property for several years. We held that the plaintiff could not contest the new church building because "a church is a church," and the plaintiff had previously acquiesced to the prior church building. *Cherry*, *supra* at 501. Unlike the church in *Cherry*, the use of Lot 52 as a dog park differs considerably from its previous use as a vacant park.

In rejecting our determination that the dog park constitutes a "more serious" violation, the dissent criticizes this opinion by arguing that "there are no court findings" in support of our conclusion that the dog park constitutes a "more serious" violation. *Post* at 13. However, no "court findings" are necessary. When a city affirmatively encourages the use of a park for a purpose that previously has been prohibited,[15] the record supports the conclusion that a "more serious"

---

[15] The dissent asserts that "the facts must be considered in the light most favorable to defendant," *post* at 14 n 13, to support its contention that the facts in this case do not indicate that the dog park constitutes a "more serious" violation. When considering a motion for summary disposition under MCR 2.116(C)(10), a court should "draw[] all *reasonable* inferences in the nonmovant's favor." *de Sanchez v Dep't of Mental Health*, 455 Mich 83, 89; 565 NW2d 358 (1997) (emphasis added). The dissent would apparently find that a reasonable inference may be drawn that fewer people will use Lot 52 after the erection of the dog park. However, because Lot 52 has been transformed from a vacant lot to a dog park,

20

violation is shown because some number of people will, in fact, use the park for that purpose.[16]

The dissent further criticizes this opinion by stating that a new structure has not been permitted on Lot 52 because, before the dog park, "it appears that three sides of the lot were already fenced." *Post* at 15. However, even accepting this fact, the dissent ignores the fact that the building of the dog park required still another fence to be built, which then fully enclosed the area. Before the dog park, no such enclosure existed. Moreover, the dissent completely disregards the other factors that suggest that the dog park constitutes a "more serious" violation.

In conclusion, the dissent's argument that the parties intended to include a dog park within the ambit of "residential" use erroneously relies on foreign precedent rather than on the actual language used by the parties to the deed restriction. Moreover, although the dissent relies on *Cherry* to support its claim that a "more serious" violation did not occur here, *Cherry* does not support its

---

and defendant is actively encouraging the use of Lot 52 by dog owners after such use was previously prohibited, such an inference is not reasonable, in our judgment.

[16] The dissent claims that "we do not know whether dogs were prohibited from the park" or, if dogs were prohibited, "how long" such a prohibition existed. *Post* at 14 n 12. However, the record is clear that, before the introduction of the dog park, dogs were prohibited. Further, defendant failed to demonstrate that the prohibition was of recent origin, acknowledging several times at oral argument that "we don't know when the ['No Dogs'] sign went up." Even supposing that dogs were permitted in the park for some unknown period before their prohibition, the dissent simply ignores the difference between an occasional dog in the park and the regular and continuous use encouraged by a dog park.

21

argument because, unlike the instant case, the prior use in *Cherry* was indistinguishable from the use objected to. Further, the dissent's arguments that the dog park is not a "more serious" violation of the deed restriction fail to demonstrate that we have improperly applied the relevant factors in this case.[17]

## V. CONCLUSION

We affirm the Court of Appeals holding that the use of Lot 52 both as a park and as a dog park violates the deed restriction that limits the use of Lot 52 to "strictly residential purposes only." We further affirm the Court of Appeals conclusion that plaintiff may enforce the deed restriction despite plaintiff's failure to contest the use of Lot 52 as a park, because the use of Lot 52 as a dog park constitutes a "more serious" violation of the deed restriction. We remand this case to the trial court for the entry of an order of summary disposition in favor of plaintiff, and for a determination of the appropriate remedy.

Stephen J. Markman
Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.

Cavanagh, J. I concur in the result only.

Michael F. Cavanagh

---

[17] Although the dissent asserts that this decision will "increase lawsuits," *post* at 16, we have applied this rule for at least 80 years without any appreciable flood of litigation.

22

STATE OF MICHIGAN

SUPREME COURT

BLOOMFIELD ESTATES IMPROVEMENT
ASSOCIATION, INC.,

      Plaintiff-Appellee,

v                                      No. 130990

CITY OF BIRMINGHAM,

      Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

      This is a dispute over a dog park. Three years ago, defendant city of Birmingham fenced off one acre of property in a city park[1] to allow dogs to run off-lead under the supervision of their owners. Plaintiff Bloomfield Estates Improvement Association, Inc., sued to block defendant from this use by seeking to enforce a deed restriction that limited portions of the park to residential purposes.

      A majority of this Court holds that using the lot as a dog park violates the deed restriction. It also holds that plaintiff can enforce the deed restriction even though plaintiff failed to object to use of the lot as a park for over 75 years. Because I disagree on both points, I respectfully dissent.

---

[1] The record suggests that the park itself is fenced and restricted to residents of the city of Birmingham, perhaps only to fee-paying residents. Others may be admitted, if at all, only as guests of residents or on an increased fee basis.

FACTS

This case arises out of defendant's use of lot 52 of Bloomfield Estates Subdivision. Deed restrictions on the lot were recorded in 1915 by the Bloomfield Estates Company. The relevant language states that "[e]ach lot or lots shall be used for strictly residence purposes only and no buildings except a single dwelling house and the necessary out-buildings shall be erected or moved upon any lot or lots . . . ."

In 1928, Bloomfield Township purchased lot 52. It planned to use the land as part of a park. Later that year, the township opened the park, and lot 52 has been parkland since that date. In 1938, defendant city of Birmingham acquired the park from the township and renamed it Springdale Park. Since its opening, various improvements have been made, including addition of a baseball diamond, golf course, community house, and clubhouse.

In 2004, defendant fenced off a grassy part of lot 52 to be used exclusively as a dog park.[2] After construction of the off-leash dog area, plaintiff, which had been deeded the rights of Bloomfield Estates Company in 1955, sued to close the dog park. Defendant moved for summary disposition, and the trial court granted the motion, finding that plaintiff had not shown that defendant's use of the lot violated the deed restriction.

---

[2] Defendant asserts that three sides of the lot were already fenced before it became a dog park. Appellant's reply brief, p 2. Plaintiff does not contest that statement.

Plaintiff appealed. In a two-to-one decision, the Court of Appeals reversed. Unpublished opinion per curiam of the Court of Appeals, issued March 14, 2006 (Docket No. 255340). The Court of Appeals majority found that use of the lot as a park violated the deed restriction. It also found that plaintiff had acquiesced in the use and that plaintiff could no longer seek enforcement of the deed restriction against that use. However, the majority limited the acquiescence to the actual use to which plaintiff had acquiesced. And because it found that a dog park was a more serious violation of the restrictive covenant, the majority held that plaintiff could enforce the deed restriction against that use. Accordingly, the majority remanded the case to the trial court for entry of summary disposition in plaintiff's favor. Judge Borrello dissented. He would have found that plaintiff waived its objection and was barred from bringing an action to enforce the deed restriction.

Plaintiff applied for leave to appeal in this Court. We granted the application and directed the parties to include among the issues to be briefed "whether the use of Bloomfield Estates Subdivision lots in Springdale Park violates the deed restrictions, whether plaintiff is estopped from seeking enforcement of the deed restrictions, and what remedies may be available if there are violations of the deed restriction." 477 Mich 958 (2006).

STANDARD OF REVIEW

This court reviews de novo a decision whether to grant or deny a motion for summary disposition. *Haynes v Neshewat*, 477 Mich 29, 34; 729 NW2d 488

3

(2007). The scope of a deed restriction is also reviewed de novo. *Terrien v Zwit*, 467 Mich 56, 60-61; 648 NW2d 602 (2002).

USING THE LOT AS A DOG PARK DOES NOT VIOLATE THE DEED RESTRICTION

The relevant portion of the deed restriction provides that lot 52 must be used for residential purposes. The initial consideration, therefore, is whether a dog park is consistent with a residential purpose. If it is, then the restriction has not been violated. Only if use as a dog park is not a residential purpose must the Court decide whether to enforce the restriction against the dog park.

In giving meaning to the phrase "residential purpose," an important concept should be considered. This Court has long held that restrictions on the otherwise free use of land must be explicit in terms and cannot be enlarged or extended by construction. *In re Nordwood Estates Subdivision*, 291 Mich 563, 568; 289 NW 255 (1939). As recently as eight years ago, we reiterated our rule: restrictive covenants are to be strictly construed against the party seeking to enforce them and all doubts resolved in favor of the free use of property. *O'Connor v Resort Custom Builders*, *Inc*, 459 Mich 335, 340; 591 NW2d 216 (1999).

Although Michigan courts have been called on to construe restrictions containing language similar to the covenant involved here, no Michigan court has ever explicitly defined the phrase "residential purpose." The majority now does that. In giving meaning to the phrase, it relies heavily on a dictionary and defines "residential purpose" to include only "a 'single dwelling house' and immediately

4

related purposes." *Ante* at 9. On the basis of this definition, the majority finds that use as a dog park is not a residential purpose.

The majority's decision is flawed for several reasons. First, ignoring this Court's long-established principle of construction, it construes the deed restriction against, not in favor of, the free use of property. The majority spends pages discussing the right to contract, never even mentioning the fundamental right of a landowner to use his or her property as he or she sees fit.[3] Because of the vital importance of this right, any restriction on the future use of real property must be drawn with particularity. *O'Connor*, 459 Mich at 340. The restriction at issue allows the property to be used for residential purposes. Rather than interpreting this phrase broadly to protect the owner's right to use the property, the majority interprets it in an extremely narrow fashion. This is error.

Second, the majority's definition essentially reads language out of the deed restriction. The full restriction provides that "[e]ach lot or lots shall be used for strictly residence purposes only and no buildings except a single dwelling house and the necessary out-buildings shall be erected or moved upon any lot or lots . . . ." There are two components to the restriction, one limiting the use of the lots to residential purposes and a second prohibiting "buildings except a single dwelling house and the necessary out-buildings." By defining residential purposes

_____

[3] The legal concept of property includes the right to freely use the property. "'Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment and disposal.'" *James S Holden Co v Connor*, 257 Mich 580, 592; 241 NW 915 (1932) (citation omitted).

5

to include only single dwelling homes and immediately related purposes, this Court reduces to a redundancy the language prohibiting buildings other than single dwelling houses. If residential purposes include only "a 'single dwelling house' and immediately related purposes,"[4] then the language in the restriction explicitly limiting buildings to single dwelling houses would be unnecessary. It is well established that a construction that would entirely neutralize part of the language that is being construed should be discarded. See, e.g., *DeBoer v Geib*, 255 Mich 542, 544; 238 NW 226 (1931).

Because the majority's dictionary-derived definition of "residential purposes" violates well-established rules of construction and reduces other language in the restriction to a redundancy, it must be rejected. In its place, I would accept the definition adopted by most other states.

Here are but a few of them: In 1994, the Indiana Court of Appeals decided whether the defendants' use of their property as a baseball facility violated a restrictive covenant limiting the property to residential purposes. *Bagko Dev Co v Damitz,* 640 NE2d 67, 68 (Ind App, 1994). Because the covenant did not define the term "residential purposes," the court found it necessary to give it meaning. *Id.* at 70. After reviewing caselaw from other jurisdictions, the court concluded that a use is for residential purposes as long as the use is "'distinguishable from commercial or business use.'" *Id.* at 70 (citation omitted). And because the

_____

[4] *Ante* at 9.

6

defendants were not using the baseball diamond for business or commercial purposes, the court held that the restrictive covenant had not been violated. *Id.* at 71.

Similarly, in 1992, the New Hampshire Supreme Court decided that using property as a dock did not violate a deed restriction that limited its use to residential purposes. *Voedisch v Town of Wolfeboro*, 136 NH 91, 96; 612 A2d 902 (1992). The court held that "covenants restricting the use of property to 'residential purposes' merely limit the use of the property to living purposes as distinguished from business or commercial purposes." *Id.*

And in 1985, the Texas Court of Appeals was called upon to decide whether building a tree house on a lot violated a residential purposes restriction that ran with the deed. *Winn v Ridgewood Dev Co*, 691 SW2d 832, 833; (Tex App, 1985). The court held:

> The term "residential purposes" requires the use of property for living purposes as opposed to business or commercial purposes. Considering only the evidence favorable to the jury's finding, we can find no evidence that Lot 2 was not being used for living purposes. Since there was no evidence that Lot 2 and the treehouse were being used for business or commercial purposes, the only logical conclusion is that it was being used for "living purposes" and that the character of the treehouse is consistent with a residential use. [*Id.* at 835 (citations omitted).]

These three decisions are illustrative of how other states have treated residential purposes restrictions. They are far from exhaustive. As recognized by the American Law Reports, "[a]s a general proposition, restrictive covenants built around the terms "residence" or "residential purposes". . . merely limit the use of

7

the property to living purposes as distinguished from business or commercial purposes."[5] Many more state court decisions have employed the same reasoning.

These decisions not only reflect the weight of authority across the country, they are consistent with Michigan caselaw. See, e.g., *O'Connor*, 459 Mich at 340 ("'[a] restriction allowing residential uses permits a wider variety of uses than a restriction prohibiting commercial or business use'") (citation omitted); *Beverly Island Ass'n v Zinger*, 113 Mich App 322, 326; 317 NW2d 611 (1982) ("A restriction allowing residential uses permits a wider variety of uses than a restriction prohibiting commercial or business uses.").

Yet, rather than consider and give weight to these decisions, the majority simply takes out a dictionary and crafts its own definition of "residential purposes." It ignores learned jurists from this and other jurisdictions representing decades of experience in interpreting the law.

---

[5] Anno: *Restrictive covenant limiting land use to "private residence" or "private residential purposes": Interpretation and application*, 43 ALR4th 71, 76, § 2[a]. See, e.g., *Isbrandtsen v North Branch Corp*, 150 Vt 575, 581; 556 A2d 81 (1988) (a deed restricting use to "'residence purposes' simply limits the use to residential [as opposed to business or commercial] purposes"); *Shermer v Haynes*, 248 Ark 255, 260; 451 SW2d 445 (1970) ("'[i]t is the weight of authority that [a residential purposes restriction], in and of itself, does not prohibit use of the land for the various types of multiple dwellings, the courts frequently remarking that the effect of the term is only to limit the use of the property to living as distinguished from business or commercial uses'") (citation omitted); *Baker v Smith*, 242 Iowa 606, 609; 47 NW2d 810 (1951) ("it is the weight of authority that restrictions built around the terms 'residence' or 'residential purposes', without more, merely limit the use of the property to living purposes as distinguished from business or commercial purposes").

It is not uncommon for this Court to adopt other states' definitions of legal terms when those states have grappled with similar facts and law.[6] In this case, I would take instruction from some of these jurisdictions and hold that covenants restricting property to residential purposes "merely limit the use of the property to living purposes as distinguished from business or commercial purposes." *Voedisch*, 136 NH at 96.

---

[6] See, e.g., *Glass v Goeckel*, 473 Mich 667, 674 n 4; 703 NW2d 58 (2005) ("We refer to a similarly situated sister state . . . for a credible definition of a term long employed in our jurisprudence."); *Dep't of Civil Rights v Gen Motors Corp*, 412 Mich 610, 646; 317 NW2d 16 (1982) (opinion by Williams, J.) ("while we are certainly not controlled by such case law from other jurisdictions, we can be guided by it when it is determined to be appropriate and sound"). Indeed, it is appropriate to "construe 'technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law' according to such peculiar and appropriate meaning." *Greene v A P Products, Ltd*, 475 Mich 502, 509; 717 NW2d 855 (2006) (citation omitted). The fact that a large number of sister states have identically defined "residence purposes" indicates that this phrase has attained a peculiar and appropriate meaning in the law. The definition that so many have given the expression is sound.

The majority criticizes me for seeking guidance from sister-state decisions. It would do better to hold a mirror up to its own decision than to criticize mine. As far as I can tell, this Court is the only court in the country that has defined a residential-purpose deed restriction solely by reference to a dictionary definition. The majority may want to consider why no other court in the country has employed the method that it has adopted. Other courts uniformly have followed a method, similar to the one I use, of considering sister-state decisions and established rules of construction. See, e.g., *Bagko*. 640 NE2d at 70-71; *Shermer*, 248 Ark at 260.

The majority also claims that the decisions I cite are distinguishable. The deed restriction in this case limits the property to residential purposes. The deed restrictions in the cases I cite limited the properties involved there to residential purposes. Therefore, these sister-state decisions are instructive in interpreting the restriction at issue in this case.

Here, nothing suggests that the dog park has any business or commercial purpose. Rather, owning dogs and walking them is a typical, generally accepted activity for the residents of Birmingham. Accordingly, because a dog park for residents is a living use of municipal land, I would hold that the deed restriction has not been violated.[7] The trial court was correct and its decision should be reinstated.

PLAINTIFF WAIVED THE RIGHT TO OBJECT TO USE OF THE LOT AS A DOG PARK

Because I would hold that the use as a dog park is a residential purpose, I find it unnecessary to determine whether plaintiff waived the right to enforce the deed restriction. But, because the majority holds that plaintiff can enforce it, I will offer my thoughts on this issue.

The majority finds that plaintiff is estopped from contesting use of the lot as a park. Lot 52 has been in a park for at least 75 years. Plaintiff was well aware of this use. Yet, at no time did it object to or take action to stop it. Even now, plaintiff does not ask the Court to prevent lot 52 from reverting to being part of Springdale Park. Even if it did, the majority opines, equity would bar plaintiff from preventing use of the land as a park. See *Cherry v Bd of Home Missions of Reformed Church in United States*, 254 Mich 496, 503-504; 236 NW 841 (1931).

---

[7] The zoning ordinances of the city of Birmingham and Bloomfield Township list such things as parks, playgrounds, and recreational facilities as principal uses in residential districts. Because deed restrictions are to be construed in light of surrounding circumstances, these zoning ordinances add support to my conclusion that use as a dog park is a residential purpose. See *Brown v Hojnacki*, 270 Mich 557, 560-561; 259 NW 152 (1935).

Nonetheless, the majority holds that plaintiff may challenge use of the lot as a dog park. The reason it gives is that a dog park is a more serious violation of the deed restriction than a city park. Once again, I disagree.

In *Boston-Edison Protective Ass'n v Goodlove*,[8] this Court was called upon to decide whether the plaintiff homeowners association was estopped from enforcing deed restrictions limiting the property in question to single dwelling houses. *Goodlove,* 248 Mich at 627. The defendant, a practicing physician, had incorporated his medical office into his home and worked there for years without objection. *Id.* at 628. When the defendant, because of increasing business, decided to build an office building on the land, the plaintiff objected, claiming that this use violated the deed restrictions running with the property. The issue was whether the plaintiff had waived the right to enforce the restriction by failing for years to object to use of the property as a doctor's office. *Id.* at 629. The Court decided that the plaintiff could enforce the restriction. It stated:

> While it is true that there has been no objection made to the defendant's practicing medicine at his home and using it as a doctor's office where patients consulted him, nevertheless, the defendant should not be able to violate further rights of plaintiffs on account of his theretofore slight breach of the restrictive covenants in his deed. Plaintiffs are not estopped from preventing a most flagrant violation of the restrictions on account of their theretofore failure to stop a slight deviation from the strict letter of such restrictions. While it is true that by their acquiescence they may not be able to enjoin defendant from continuing to use his present home to the extent that it has been heretofore used as a doctor's office, they are still in a position to stop the more serious violation of the

---

[8] 248 Mich 625; 227 NW 772 (1929).

11

restrictions that would result from the erection of a new or adjoining building, one story in height, without basement, etc., which does not conform with the restrictions of the subdivision. [*Id.* at 629-630.]

Accordingly, the general rule is that a plaintiff is "not estopped from preventing a *most flagrant violation* of the restrictions on account of their theretofore failure to stop a slight deviation from the strict letter of such restrictions." *Id.* at 629 (emphasis added). See also *Jeffery v Lathrup*, 363 Mich 15, 22; 108 NW2d 827 (1961) (a deed restriction that has been violated in some degree "does not thereby become void and unenforceable when a violation of a more serious and damaging degree occurs").

In *Cherry*, this Court applied this rule and decided whether the plaintiff property owners should be estopped from enforcing deed restrictions that limited use of certain property. *Cherry,* 254 Mich at 497-499. Despite the fact that the deed restricted the property to dwelling house purposes, the defendant planned to replace its existing church with a new church on the same property. *Id.* at 499. Ultimately, this Court refused to allow the plaintiffs to enforce the deed restriction.

> We are not impressed with plaintiffs' claim that defendant's building program will constitute an extension of the violation of the building restrictions which has already been countenanced. It is true the new building as planned will be somewhat larger, will occupy a different portion of the lots and will face on Dexter boulevard instead of Joy road. But a church is a church; and it cannot well be asserted that only so much of a church site as is actually occupied by the edifice located thereon is used for church purposes. It is common practice to use the adjacent lot area for parking purposes. It is by no means uncommon for outdoor church gatherings to make use of the whole or any part of the church yard. Defendant clearly has the right so to use its premises. [*Id.* at 501.]

12

*Cherry* is important because it illustrates that a use that is of the same nature as a previous, unobjected-to use will not amount to a "flagrant violation."[9] Here, plaintiff acquiesced in the use of the lot as a park. Plaintiff objected only when defendant began using the lot as a dog park. A dog park is of the same nature as a park. Hence, because the proposed use is of the same nature as the unobjected-to use, plaintiff cannot enforce the deed restriction against the dog park. Indeed, just as *Cherry* determined that the plaintiffs there could not enforce the deed restrictions because "a church is a church," plaintiff here cannot enforce the deed restriction because a park is a park.[10]

The majority reaches the opposite conclusion and decides that a dog park is a more serious violation. In so doing, it considers a number of statements presumably drawn from the briefs and affidavits used during the motion for

---

[9] This is consistent with prior decisions of this Court. See, e.g., *Sheridan v Kurz*, 314 Mich 10, 13; 22 NW2d 52 (1946) (The plaintiff could enforce a restriction against the defendant's use of the property as a commercial garage. Even though the prior owner violated the restriction, the prior owner used the garage for research, not commercial, purposes.); *Rich v Isbey*, 291 Mich 119; 288 NW 353 (1939) (The plaintiffs could not enforce a height restriction against the defendant's fence because previously the plaintiff had failed to object to hedges that violated the height restriction.); *Polk Manor Co v Manton*, 274 Mich 539, 541-543; 265 NW 457 (1936) (The plaintiff could enforce a restriction even though the plaintiff had failed to object to prior violations. Unlike the prior violations that mingled residential and commercial activity, the defendant's use of the property was to be solely for commercial purposes.).

[10] The majority recognizes that the plaintiff in *Cherry* could not contest the new building because "a church is a church." Nonetheless, the majority claims that my reliance on *Cherry* is misplaced. Its position is inconsistent. There is no principled reason for finding that "a church is a church," but a park is not a park.

13

summary disposition. *Ante* at 15-16. However, there are no court findings substantiating these statements. For example, the majority takes as fact that the dog park has generated more automobile traffic. The trial court made no such finding.[11] Also, the majority incorrectly asserts that dogs were prohibited from being on the property before lot 52 was transformed into a dog park. The trial court did not make this finding.[12] Given that defendant contests most or all of these points, it is error for the majority to rely on them as true.[13] See appellant's brief, pp 26-28.[14]

_____

[11] Two affidavits offered by plaintiff contain this statement: "I have no doubt that we will experience increased noise from barking dogs and traffic, the presence of strangers and strange dogs, the risk of residents being bitten and dogs jumping the fence, odors from dog droppings, and a deterioration in property values as to any property within sight or sound of Lot 52."

[12] Without factual findings by the trial court, we do not know whether dogs were prohibited from the park before the lot was made into a dog park. The fact that someone once saw a "No Dogs" sign proves only that a sign was posted by someone for an unknown period. Without knowing how long the sign was up and whether its command was actually followed, the majority should be wary of concluding that dogs generally were absent from the park.

[13] Aside from the fact that defendant contests plaintiff's version of the facts, there is an additional problem with the majority accepting plaintiff's rendition of the facts as truth. Because the issue is whether plaintiff is entitled to summary disposition (the Court of Appeals remanded the case for the entry of an order of summary disposition for plaintiff), the facts must be considered in the light most favorable to defendant. The majority should not accept as true contested facts asserted by plaintiff.

[14] E.g., defendant wrote: "No traffic or noise studies or any other impact analysis have been performed by Appellee or anyone else." Appellant's brief, p 26.

No factual findings were ever made to suggest that the dog park has brought continual and systematic use of lot 52 where before the use was irregular. Yet, the majority relies on this as a fact. The majority also assumes that establishment of the dog park required a structure where no structure had previously been permitted. No factual findings support that assumption. In fact, it appears that three sides of the lot were already fenced. Given that three sides of the lot were already fenced, it is bizarre, and obviously wrong, for the majority to conclude that no structure previously existed on the lot. If these "facts" are disregarded, as they must be, only one of the statements identified and relied on by the majority remains to support its conclusion: residents of Birmingham have been encouraged to bring their dogs to run off-leash in the dog park. This cannot constitute a more serious violation of the restriction.[15]

---

[15] The majority even goes so far as to claim that no court findings are necessary for its decision. As support for this position, it makes the blanket assertion that "[w]hen a city affirmatively encourages the use of a park for a purpose that previously has been prohibited, the record supports the conclusion that a 'more serious' violation is shown." *Ante* at 20-21. This cannot be true. For example, assume that a deed restriction prohibited people from using city park property. Assume, also, that the city allowed touch football but prohibited meditation in the park. Assume it was concerned that an oblivious meditator might be injured by an errantly tossed football. But after a public outcry from those who greatly enjoy meditating in the open air, the city decides to reverse course and prohibit all activity except meditation. This example illustrates the fallacy of the majority's blanket assertion. It cannot seriously be argued that meditation is a more serious violation of the deed restriction than touch football. Accordingly, it does not follow from the fact that a city affirmatively encourages a use that was previously prohibited that the use constitutes a more serious violation of a deed restriction. Factual findings are necessary.

Another serious fault of the majority decision is that it effectively gives people broad discretion to pick and choose which violations of the restrictive covenant will be tolerated. This will encourage someone to try to enforce a restriction after a very minor change in usage. Using today's decision, a plaintiff could disregard for years a use that is arguably contrary to a deed restriction, then object and prevent another use that is only marginally different. Besides being fundamentally unfair, permitting this pick-and-choose approach will enhance unpredictability in the law and increase lawsuits.

As a result of the above problems, the majority's approach should be rejected. In its place, I would hold that a use that is of the same nature as a previously unobjected-to use cannot amount to a "flagrant violation." And because a dog park is of the same nature as a city park, I would find that plaintiff cannot enforce the deed restriction that runs with lot 52.

CONCLUSION

The city of Birmingham has set aside a small fenced portion of one of its parks for the use of city residents and their dogs. Nothing indicates that this grassy acre, called a "dog park," has actually occasioned annoyance to anyone in the area. There is no evidence that it has been heavily used, is noisy, smelly, or has drawn increased automobile traffic. On the contrary, during the past three years, the dog park appears to have admirably filled a genuine need of dogs and dog owners in the community. It has provided a spot where canine pets can exercise off-leash, safely, under supervision, and without disturbing people.

16

The only nonspeculative objection raised about this community service is that a deed restriction, confining the land to residential purposes, outlaws it. On this basis, a majority of the Court has effectively closed the dog park. Presumably, now, the land will again be used as a city park, as it was for more than 70 years before. In that way, in the eyes of the law, the use will be proper.

I have great difficulty accepting that the use of this land as a city park conforms to the deed restriction better in any sense than its use as a dog park. My thinking is, if a park is a residential use of the land, so is a dog park. Conversely, if a dog park is not a residential use of the land, then neither is a city park.

No one claims that the dog park exists for a business purpose or for an industrial purpose. In a legal sense, what other purpose remains, aside from a residential purpose? Most other courts have followed this reasoning and have defined a residential purpose to include such things as a baseball diamond, a boat dock, and a tree house. I agree with them.

But even if I did not, and assuming the use is nonconforming, the time has long since passed when plaintiff could be heard to complain. For over seven decades, plaintiff's members have acquiesced in the use of this property as a park. Even now, they express no displeasure in it once again reverting to parkland. But they object to the dog park. How can it be that the Court allows plaintiff to pick and choose which nonconforming use of the land to object to and which to ignore? Surely, in the eyes of the law, after all these years, plaintiff has waived its claim.

17

This decision is a doggone shame. It has alarming implications for tomorrow's interpretations of restrictive covenants in Michigan. And, coming as it does during the dog days of summer when all four-legged creatures long to romp outdoors unrestrained, it marks a howling defeat for Birmingham's canine residents.

Marilyn Kelly
Elizabeth A. Weaver